Jesus ROMERO, Petitioner–Appellee, Cross–Appellant,

v.

James A. LYNAUGH, Director, Texas Department of Corrections, Respondent–Appellant Cross–Appellee.

No. 88–6100.

United States Court of Appeals, Fifth Circuit.

Oct. 5, 1989.

872

muted to life, persuaded that the ordered relief was within the broad remedial power of a federal court to fashion appropriate relief for constitutional violations.

Texas appeals, contending that counsel was effective and that in any event the district court exceeded its authority in commuting the sentence to life. Romero defends the ordered relief; he also appeals, contending that the district court erred in not finding that his lawyer was ineffective in thirteen other respects.

We are persuaded that Texas gave Romero a fair trial and that the efforts of his lawyer met the constitutional standard of effective counsel. We reverse the grant of relief and remand with instruction to enter an order denying Romero's petition for a writ of habeas corpus. We do not reach the question of authority of a federal habeas court to commute a death sentence, leaving it for a case requiring its resolution.

Robert S. Walt, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellant cross-appellee.

George Scharmen, San Antonio, Tex. (Court-apoointed), for petitioner-appellee cross-appellant.

Before CLARK, Chief Judge, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this death penalty case, the State of Texas appeals from the grant of Jesus Romero's application for writ of habeas corpus. The United States District Court for the Southern District of Texas concluded that Romero's lawyer so abbreviated the closing argument and otherwise failed to offer mitigating circumstances in the sentencing phase of the trial that he failed to render constitutionally required assistance. The court ordered the death sentence com-

I

On July 20, 1985, a Texas jury found Jesus Romero guilty of the capital murder of Olga Lydia Perales during the course of aggravated sexual assault. The jury gave affirmative answers to the two questions required by Tex.Code Crim.Proc.Ann. art. 37.071 (Vernon Supp.1988), and punishment was set at death. The judgment and sentence were affirmed on direct appeal. *Romero v. State*, 716 S.W.2d 519 (Tex. Crim.App.1986). The United States Supreme Court denied certiorari. *Romero v. Texas*, 479 U.S. 1070, 107 S.Ct. 963, 93 L.Ed.2d 1011 (1987). On March 20, 1987, six days before his scheduled execution, Romero filed an application for writ of habeas corpus in the state trial court pursuant to Tex.Code Crim.Proc.Ann. art. 11.-07 (Vernon Supp.1988). The trial judge found no questions of fact and forwarded the application to the Court of Criminal Appeals. That court stayed execution and remanded the case to the trial court with instructions to conduct a hearing on the issue of effective counsel. *Ex parte Romero*, No. 16,943–01 (Tex.Crim.App. March 24, 1971). On May 28, 1987, follow-

ing the ordered hearing, the trial court filed detailed findings of fact and conclusions of law. These findings by the judge who presided at Romero's trial are significant and we will return to them. The Court of Criminal Appeals denied Romero's petition for relief without written order. *Ex parte Romero*, No. 16,943–01 (Tex. Crim.App. June 9, 1987) and the trial court set Romero's execution for July 22, 1987. On July 16, 1987, Romero filed a petition for writ of habeas corpus with the United States District Court for the Southern District of Texas and on July 17, 1987, that court granted his unopposed request for stay of execution. The federal district court did not conduct an evidentiary hearing, but relied upon the transcript of the hearing before the state trial judge. It rejected Romero's broad gauged attack on the constitutionality of the Texas death penalty statutes, and rejected asserted errors in the failure of the trial judge to instruct the jury, sua sponte, regarding mitigating factors to be considered at the sentencing phase, and to define the meaning of the words "deliberately" and "proof beyond a reasonable doubt." It then rejected thirteen specifications of ineffective assistance of counsel at trial, concluding that they failed to "pass the 'deficiency' prong of the *Strickland* analysis." Romero and Texas appeal only the rulings on ineffective assistance. We will first describe the events at trial and then turn to the habeas findings of the state trial judge regarding the performance of Romero's lawyer. Finally, we will address the district court's decision regarding each of the asserted failures.

## II

Jesus Romero's role in the rape and slaying of Olga Lydia Perales are set out in the opinion of the Court of Criminal Appeals:

[Romero], along with Jose Cardenas, Davis Losada and Rafael Leyva were indicted for the offense of capital murder of the victim, a fifteen-year-old junior high student in San Benito. Said offense was alleged to have occurred on December 23, 1984.

Codefendant Leyva, who was sixteen years of age at the time, went to his juvenile probation officer on January 8, 1985 and reported the instant offense. Texas Ranger Bruce Casteel, District Attorney Alvarado and an attorney for Leyva, Horacio Berrera (who continued to represent Leyva) were summoned. Leyva made a statement at that time about the offense in which he admitted his presence at the offense but denied any other involvement.

At trial Leyva testified on behalf of the State. The testimony of Leyva at trial reflected the following. A party, which was attended by the deceased, was held at Ray Amaya's house in San Benito on the night in question. Cardenas, Losada and [Romero] approached Leyva in downtown San Benito in Cardenas' car and invited him to go to a party with them. Prior to arrival at Amaya's house they went "cruising" for about an hour during which time all of them were drinking beer and smoking marijuana. Upon arrival at Amaya's house it was discovered that the party had broken up and only Amaya and the deceased were present. The deceased came out and "started going to the car slowly ... all of a sudden Jesse [Romero] pushed the girl [the deceased] inside the car." Cardenas was in the driver's seat and [Romero] pushed the deceased into the passenger side of the front seat. "Jesse [Romero] was holding the girl's head down.... He was holding it with the right hand on her head pushing to her knees ... he was telling her just to keep quiet." The testimony of Leyva reflects that they drove to a place beside the lake called La Piedra. During that time [Romero] was holding the deceased's head down and telling her to be quiet. The deceased was asking to "leave her alone" and "take her home." Davis Losada first had sex with the deceased. Davis put "a knife to her neck ... and she got on 'four' giving Davis a blow job ... the girl was saying to take her home and just to leave her alone and Davis was telling her to shut up and if she didn't shut up something was going to

happen to her, and the girl was kind of like weeping ..."

[Romero] "unzipped his pants and got inside the car while the girl was on 'four,' and still gave Davis the blow job, he got in through the back and started having sex with her." After [Romero] finished, Leyva "started having sex with her in the back." The deceased continued to ask to be taken home and Cardenas removed a pipe from the car that "looked like a baseball bat." A discussion ensued as to whether the deceased would tell anyone and the deceased insisted that she would keep quiet and say nothing. Leyva testified that he told the others that she would keep quiet and they kept telling him "That's no good. She's going to say something and we are going to get in trouble." Cardenas handed Leyva the pipe and Leyva hit the girl on the forehead with the pipe. The deceased did not fall down and [Romero] grabbed the pipe out of Leyva's hand and "started hitting the girl ... he was hitting her head with both hands on the pipe." The deceased fell to the ground after [Romero] hit her the second time and after she fell to the ground Romero hit her "three or four or five times at the most." The girl stopped making noise after [Romero] "finished hitting her." Someone else hit her "three or four times." Leyva then observed Cardenas hitting the girl "with both hands on the pipe." "Jesse [Romero] was giggling while he was hitting the girl." Losada told Leyva to "grab the girl." Losada and [Romero] "both came at me with knives." [Romero] then observed the girl move and Losada said "Just to make sure she's dead, I'll stab her." Losada again told Leyva to drag the girl into the bushes and after dragging her "halfway," Davis told [Romero] "to give me a hand" and "my [sic] and Jesse [Romero] dragged the girl way back in the bushes." [Romero] with a knife in his hand told Leyva "Stab her or I'll stab you." Leyva stabbed the girl "from the waist to her chest" and gave the knife back to [Romero]. Leyva and his three companions returned to the car and they

left the scene and Losada said, "We all did it, you know. Everybody had a part in it." Losada threw the knife "into some canal." [Romero] then handed his knife to Losada so he could throw it out. Cardenas stopped on a bridge and Losada threw the girl's clothes out. Leyva was instructed by Losada to not tell anyone that they were together. The remaining three were going to say "all we know is that we dropped the girl off at the Azteca." Losada warned Leyva "Just keep your mouth shut and if you don't the same thing is going to happen to you."

[Romero] made a written confession, the following portions of which were admitted into evidence.

Omitting the warning and formal parts, the confession recites:

The party started to break up around 11:00 or 11:30 p.m. We left in Joe's [Cardenas] car. Joe was driving. Davis [Losada] and Rafa [Leyva] were in the back seat. We drove out to what is known as La Piedra and drove down a narrow road from a bigger road for approximately one city block in distance. Davis, with the knife in one hand, forced [deceased] to make out with him, Rafa made out with her, then Joe made out with her. Davis got a pipe and started hitting [deceased] about the head. Rafa hit her also. Joe did hit her. Afterwards, [deceased] was laying there and Davis stabbed her. After Davis stabbed her Rafa got a hold of one leg and I got a hold of the other leg and we pulled her into the bushes. I don't know what happened to the pipe and didn't see it anymore when we left the area.

When we left the area Joe was driving. Rafa and I were in the back seat, and Davis was in the front passenger side. As we traveled down a dirt road, Davis got rid of the knife that was used to stab [deceased] and also got rid of another knife. He did this by throwing the knives out the window. We then traveled some more and we then stopped on a small bridge that

goes over a drainage ditch there by the overpass that is close to the Valley Buick Company located just southeast of San Benito. When we stopped there Davis gave Rafa some other items and Rafa threw those out in the drainage ditch also.

Rafa was dropped off first by the Bertha Cavazos School.

"I have been shown two photos by Investigator Joe Alvarado of the District Attorney's Office and I have identified both pictures as being # 1, that of [deceased], the way we left her that night there in the bushes. Photo # 2 is the way we left [deceased] after Rafa and I dragged her into the bushes. I have initialed, dated, and placed the time on both photos."

A search of [Romero's] residence resulted in the recovery of a man's "blooded underwear" at the bottom of a garbage bag. Raul Guajardo, a chemist with the Department of Public Safety, testified his analysis revealed that human blood was on the sides of the underwear. The findings were consistent with either Type A or Type AB. Blood samples from the deceased and [Romero] were both type A. Blood samples of the three codefendants showed all of them to be type O.

As part of his plan to persuade the jury of Romero's lesser involvement, Wood attacked the credibility of the state's witness, Leyva and argued in closing at the guilt phase that Romero's involvement was more limited than Leyva had testified. Wood offered two witnesses, his sister Leticia Esparza and Alejandro Espinoza, a lab technician. Wood, consistent with his plan, attempted by this testimony to offer an innocent explanation for the shorts with blood stains of his type, found in a search of the home following the murder. The sister testified that Sylvia, one of Romero's three other sisters, and one of ten children, was Mongoloid and lacked full ability to care for herself; that she had found Sylvia's blood stained briefs at home on previous occasions. The technician testified that Sylvia's blood sample tested A-positive.

At the sentencing phase, convicted of capital murder, Romero's difficult situation became even more grim. The state presented witnesses who testified concerning other assaults of women by Romero. Marianne Alvarez testified that less than three weeks before Olga Perales's murder Romero, armed with a pistol, attempted to force her into a stolen car. When she resisted he beat her in the face with his fist stopping only when a passing motorist produced a pistol and fired at a then fleeing Romero.

The state then produced Norma Charles who testified that only eight days before Olga Perales's murder Romero assaulted her as she walked home, knocking her to the ground and hitting her fifteen to twenty times in the face with his fists and beating her head on the pavement. He fled when her boyfriend, Henry Thomas came upon the scene. Thomas also testified at the punishment phase, corroborating Norma Charles's testimony. Three local police officers then testified to Romero's bad reputation, and of Romero and his brothers fighting with their father. They testified that Romero's family was very violent. Romero did not testify at trial.

Romero's lawyer had argued extensively at the guilt phase and offered only the following in closing at the sentencing phase:

Defense Counsel: Ladies and Gentlemen, I appreciate the time you took deliberating and the thought you put into this. I'm going to be extremely brief. I have a reputation for not being brief.

Jesse, stand up. Jesse?

The Defendant: Sir?

Defense Counsel: Stand up.

You are an extremely intelligent jury. You've got that man's life in your hands. You can take it or not. That's all I have to say.

### III

There were three witnesses at the evidentiary hearing before the state trial judge on Romero's state habeas petition. Two attorneys testified as expert witness-

es, responding to hypothetical questions. Jon Wood, Romero's lawyer at trial and on appeal, testified, explaining his trial plan. The trial judge found that Wood was licensed in 1974; that his experience included three years as a Cameron County prosecutor and the trial of hundreds of criminal cases including many capital cases. The court found that while Wood had not filed discovery motions the prosecutor had opened his entire file to Wood, except the statements of its witnesses and the report of its chief investigator; that Wood otherwise had obtained the statements of witnesses as well as the case report by virtue of a Juvenile Certification hearing of Rafael Leyva, Jr. The state trial judge found that Wood had seen the case tried three times having sat throughout the trials of Davis, Losada, and Cardenas. He found that Wood had requested and obtained the appointment of a psychiatrist whose report ruled out any insanity defense. After rejecting each of the asserted deficiencies in Wood's work, the trial court concluded that none, in any event, met the test of prejudice set out in *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

### IV

The federal district court rested its grant of relief upon the failure of Wood to offer more extensive argument. The court was persuaded that "the decision to not present a more extensive argument at punishment 'precluded the jury from considering any mitigating factors and waived [Romero's] constitutional rights guaranteed by *Lockett*....'" It concluded that, according to the record, Wood could have argued that Romero was a teenager; that Romero was intoxicated at the time of the offense; and that his family background might have made his acts "understandable" if not "justifiable." The court observed that the decision "not to present any argument at the sentencing phase" was so "patently unreasonable" as to constitute a deficiency under *Strickland*. Finally, it concluded that there was "a reasonable probability that absent this deficiency, the jury would have

sentenced Romero to life imprisonment rather than death." The district court then ordered that the death sentence be "commuted to life imprisonment."

The district court summarily rejected Romero's first thirteen allegations of ineffective assistance with the observation that they failed to meet either the "deficiency" or "prejudice" prongs of *Strickland*. We turn first to the basis for the grant of relief and then to the thirteen rejected specifications of ineffective assistance of counsel.

### V

Our "judicial scrutiny of counsel's performance must be highly deferential." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). We are to make every effort to eliminate "the distorting effect of hindsight." *Id.* Finally, we are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

### A

█ It is not clear whether the district court's finding of ineffective assistance of counsel faulted only the lawyer's decision to argue as he did in sentencing or whether the court was also critical of the decision to not offer evidence at the sentencing phase. As we read its ruling, the perceived fault was in not presenting mitigating factors that were available, a failure curable by argument. This reading is supported by the district court's observation that "If defense counsel had merely decided not to offer evidence at the sentencing phase, the standards set forth in [*Bell v. Lynaugh*, 828 F.2d 1085 (5th Cir.), *cert. denied*, 484 U.S. 933, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987)] would lead the court to defer to defense counsel's judgment ... defense counsel not only failed to put on evidence but also failed to make any substantial final statement at the sentencing phase of the trial." As we have stated, the federal district court observed that "the record reveals that defense counsel had sufficient grounds to argue ... several mitigating

factors ..." including youth, intoxication and family background. In short, the district court quarreled with Wood's decision to handle the sentencing phase as he did.

We are persuaded that the district court failed to give Wood, an experienced trial lawyer, the latitude necessary to try a difficult case. Wood's task was formidable. His client had confessed to participating in a brutal rape and killing of a fifteen year old girl. Leyva, a sixteen year old participant, testified for the state and the physical facts corroborated his testimony. Within weeks of the charged crime Wood's client had assaulted two other females. The client did nothing to help his own cause. Indeed, at trial the lawyer found his client laughing in the presence of the jury at the grisly details of the slaying.

There is no question that Wood engaged in substantial preparation for trial. He obtained access to the prosecutor's file, even the report of the state's investigator, and observed each of the three trials of Romero's confederates. He knew the jury. He knew the community. As for the events of trial, there is nothing to suggest that any mitigating facts were not before the jury. Romero's youth was obvious. Romero's sister, while testifying at the guilt phase, told the jury of the family size and of the handicapped sister. Unfortunately for Romero, not all the product of inquiry into Romero's home life was necessarily mitigating. Police officers testified at the sentencing hearing that the family was violent and the brothers were fighting with the father. Jurors might view this evidence as explanatory of Romero's violence or the jury might see it as further evidence of unchecked aggression. There was also evidence that Romero and the others were drinking at the time of the offense. At the same time, any suggestion that Romero was so intoxicated that the jury was likely to give it substantial weight in considering his moral culpability is belied by the record. In sum, while Romero's lawyer did not present evidence at the sentencing phase of trial, the fact is that the evidence of possible mitigating factors was before the jury. It follows that the relevant inquiry is whether Wood's dramatic

ploy in the sentencing hearing fell off the constitutional range.

Given his difficult situation, we are not prepared to fault Wood's effort to highlight the heavy responsibility of the jury by not burdening them with the obvious and avoiding the risk of losing them by arguing the absurd. To do so comes close to insisting on a pro forma argument in every case. Had the jury returned a life sentence the strategy might well have been seen as a brilliant move. That it did not does not mean that it was outside the range of reasonable professional assistance.

## B

We turn to Romero's argument that the district court erred in not finding that Wood was ineffective in thirteen additional respects. First, Romero argues that Wood filed a notice of intent to raise an insanity defense but did not do so. This ignores the fact that the notice accompanied a request for examination by a psychiatrist, which was granted. The filed report of examination found Romero was competent to stand trial; that he suffered no mental disease or defect which would impair his ability to distinguish right from wrong; and that while he was intoxicated at the time of the offense, he was able to realize the consequences of his conduct.

Romero next complains of the district court's rejection of his contention that Wood was ineffective in not moving to suppress the results of the search of Romero's house or to suppress Romero's confession. There is nothing in the record to suggest a basis for such motions and Romero suggests none. There was no error.

Romero next argues that Wood failed to file a discovery motion, to object to photographs, or to request a change of venue. We have otherwise described the actual discovery obtained by Wood. It exceeds the discovery obtainable by formal motion. There was no error. The photographs were admitted in the trial of Davis Losada, attended by Wood, and he had inspected them. Wood elected to focus his efforts on reducing the number of photographs of the deceased put before the jury

and objected that proffers were duplicative and cumulative. Nothing suggests that an objection footed on prejudice would have been fruitful. To the contrary, at least some of the photographs were highly relevant evidence of the nature and severity of injury inflicted. We cannot fault Wood's decision.

Wood elected to leave the trial in Cameron County, persuaded that Romero's chances with a jury were not improved by a change of venue. We are pointed to nothing to fault this judgment call.

■ Romero next contends that the district court erred in rejecting his assertion that Wood was ineffective in his handling of jury selection; that he failed to challenge for cause five veniremen when he might have done so, and was "inattentive to the requirements of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)." The *Witherspoon* allegation is no more than a conclusion. We are pointed to nothing in the record to support it. The selection of the jury was explored in the evidentiary hearing before the state trial judge on Romero's habeas petition. At that hearing Wood, while unable to recall all the reasons for his actions taken some two years earlier, explained his reasons in general terms, pointing out that he had a personal history of the veniremen. The state trial judge found that Wood "prepared extensively for his voir dire examination of the jury and was knowledgeable of the panel by the time of voir dire." The record supports this finding.

Romero points to Cynthia Ann Noyola, an Hispanic female, who had initially stated that she would not consider the minimum punishment of five years for murder. But she explained, in response to questions by the state, that she could do so for a mercy killing. She had read or heard that one codefendant had been give a death sentence and another was sentenced to life. It is by no means plain that this information was harmful to Romero's cause.

Andres Flores explained that she could not consider the minimum penalty for murder but she gave other favorable responses such as a willingness to consider intoxication and distrust of accomplice testimony.

Romero argues that Wood should have urged the exclusion for cause of Ramon Muñoz because he had formed an opinion of Romero's guilt. However, Muñoz's testimony was that he had doubts that Romero was as innocent as anyone in the courtroom, which was the question asked. He stated that he would not call it an opinion; that he had talked about the case with co-workers who expressed the view that Romero was very young.

Finally, Romero points to Jane Bristow and Lucia Garcia. Bristow stated that where a defendant did not consider the life of the victim the death penalty would be a more humane punishment than life imprisonment. But she also was skeptical of accomplice testimony and Wood's line of defense was to discredit Rafael Leyva's testimony and convince the jury of Romero's lesser role in the crime. Garcia had expressed shock that such a crime occurred in her hometown of San Benito, but she had formed no opinion regarding Romero's guilt and believed in the presumption of innocence.

■ We are persuaded that none of these decisions by trial counsel fall outside the range of acceptable judgment. The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts. Indeed, we recognize this cold fact of life by our standard for reviewing the rulings of judges presiding over jury selection. The Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), pulled back from earlier language in *Witherspoon* suggesting a de novo review of such decisions, requiring that federal habeas courts review by a clearly erroneous standard. The point is not that we review claims of ineffectiveness by a similar standard but rather that the standard by which we review decisions by trial judges accepts the reality that the selection process is more an art than a science, and more about people than about rules. While our review of the ultimate decision regarding effectiveness of counsel is essentially de novo, our willingness to second guess them must be in-

formed by the reality of their task and the limits of the recording of their work before us.

Romero points to seven instances in which Wood is said to have failed to block the receipt of evidence. In each instance, the evidence was either clearly admissible or duplicative of evidence properly received. It is unnecessary to review them seriatim. We agree with the trial court that there has been no showing of prejudice under *Strickland* even were we persuaded, and we are not, that Wood erred in the manner asserted.

In sum we are persuaded that Jesus Romero was represented by competent counsel and received a fair trial. We affirm the district court's decision rejecting claims of the petition for habeas corpus. We vacate the stay of execution, reverse the decision granting relief, and remand the case to the district court with instruction to dismiss the petition for writ of habeas corpus.

Affirmed in part, reversed in part, and remanded.