**Gary Lee DAVIS, Petitioner,**

v.

**EXECUTIVE DIRECTOR OF the DEPARTMENT OF CORRECTIONS, as head of the Department of Corrections, Ari Zavaras, Respondent.**

Civ. A. No. 94–Z–1931.

United States District Court, D. Colorado.

June 28, 1995.

Gary Lee Davis, Canon City, CO, pro se.

Dennis W. Hartley, Dennis W. Hartley, P.C., Colorado Springs, CO, Michael G. Katz, Vicki Mandell–King, Federal Public Defenders Office, Denver, CO, for Gary Lee Davis.

Robert M. Petrusak, Atty. General's Office, Gen. Legal Services Section, Denver, CO, Steven L. Bernard, County Attys. Office, Robert S. Grant, Dist. Attys. Office, Brighton, CO, for Colorado Dept. of Institutions.

## ORDER

WEINSHIENK, Judge.

This matter is before the Court on Gary Davis' Petition For Writ Of Habeas Corpus. The Court has reviewed fully the trial and appellate proceedings in the Colorado state court system, and has considered the additional evidence submitted by petitioner. The Court is satisfied that petitioner's rights were fully protected at trial and that counsel more than adequately represented petitioner at trial. Therefore, the Petition For Writ Of Habeas Corpus will be denied, for the reasons more fully set forth below.

## I. BACKGROUND

Petitioner Gary Davis and his ex-wife, Rebecca Fincham, were charged in the kidnapping, sexual assault, and murder of Virginia May. In 1987, Davis was found guilty of murder in the first degree after deliberation, murder in the first degree (felony murder), conspiracy to commit first degree murder, second degree kidnapping, and conspiracy to commit second degree kidnapping. In addition, he admitted to four counts of being a habitual criminal. Davis was sentenced to a single life sentence on his convictions for all counts except first degree murder. He was sentenced to death for the first degree murder conviction.

Although he raised no challenge to the judgment of convictions on his direct appeal, he challenged the validity and constitutionality of his death sentence on numerous grounds. The Colorado Supreme Court affirmed Davis' convictions and death sentence in May 1990. *People v. Davis*, 794 P.2d 159 (Colo.), *modified on denial of reh'g*, (1990), *cert. denied*, 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) (*Davis I*).

Thereafter, Davis filed a motion for postconviction relief pursuant to Colo.R.Crim.P. 35(c) on January 14, 1991, alleging that his trial counsel, Craig Truman, was ineffective in the penalty phase. In his motion, Davis made the following assertions: there was no trust between the attorney and his client; Truman failed to employ a psychiatrist to assist in repairing the relationship; he failed to employ a mitigation specialist to develop mitigating evidence; he failed to investigate fetal alcohol syndrome, and the effects of Davis' severe alcoholism; he failed to employ a psychiatric expert to explain the bizarre relationship between Fincham and Davis and her influence upon him; and he failed to present evidence concerning Davis' childhood, broken home, and the abuse he suffered.

A hearing was scheduled for February 19, 1991. On February 13, Davis moved for a continuance, attaching three affidavits to his motion. The request was denied, but the trial court gave counsel sixty days in which

to reopen upon the filing of affidavits, and conducted the hearing on February 19, 1991.

On February 27, 1991, the trial court denied Davis' claim of ineffective assistance of counsel. The court found that counsel investigated background witnesses and employed two investigators; that counsel believed these witnesses "would do more harm than good;" that counsel's decision not to present evidence with respect to alcoholism was based on counsel's view that alcoholism is not a mitigating circumstance, and a doctor's report that alcoholism was not a factor in Davis' actions; that the prosecution could have countered mitigation with more damaging information; that the closed head injury evidence was a red herring; and that counsel made a tactical decision not to attack the prior convictions in order to argue to the jury that society would be protected from the defendant who could receive two life sentences.

On April 10, 1991, Davis appealed to the Colorado Court of Appeals and also filed a verified motion to reopen evidence in the trial court (within the 60 days ordered by the trial court). Davis moved in the Court of Appeals for a limited remand, which was granted on May 21, 1991, for the trial court to conduct a hearing based upon Davis' offer of proof. The trial court denied the motion to reopen evidence without conducting any further hearing.

The trial court's denial of relief was affirmed by the Colorado Court of Appeals in *People v. Davis*, 849 P.2d 857, 861 (Colo.App. 1992) (*Davis II*). The Court of Appeals perceived no error in the trial court's findings as to sufficient evidence, and as to the decision to avoid unfavorable information. They stressed that counsel presented the testimony of two favorable witnesses, and determined that the lower court did not abuse its discretion in failing to grant the motion to reopen.

The Colorado Supreme Court affirmed in *Davis v. People*, 871 P.2d 769 (Colo.1994) (*Davis III*). Thereafter, this Court granted Petitioner's Motion For Stay Of Execution on August 22, 1994, and set a hearing for March 1, 1995. At that hearing, the Court heard mitigation testimony from four family members regarding Davis' positive influence in their lives, and oral argument on all issues except the ineffective assistance of counsel. The Court granted petitioner until April 3, 1995, to submit additional mitigation evidence relating to his alcoholism and relative accomplice culpability defense, and to have video taped depositions taken of various other family members. The Court conducted oral argument on the ineffective assistance of counsel claim on April 13, 1995.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The first argument made by Davis is that trial counsel provided him with ineffective assistance during his closing argument and in the investigation and presentation of mitigating evidence. Davis further asserted that he was entitled to an evidentiary hearing in order to enable the Court to review the various types of mitigating evidence and testimony that would have been available at the time of Davis' trial in 1987.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel...." U.S. Constitution, amend. VI. "The Supreme Court has long 'recognized that the "right to counsel is the right to effective assistance of counsel"' under the Sixth Amendment." *Osborn v. Shillinger,* 861 F.2d 612, 624 (10th Cir.1988) (quoting *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984)). The Court of Appeals for the Tenth Circuit has recently held that "[t]his right extends to a capital sentencing hearing." *Brecheen v. Reynolds,* 41 F.3d 1343, 1365 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995) (citing *Harris v. Dugger,* 874 F.2d 756, 762 (11th Cir.), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989)).

 To prevail on a Sixth Amendment claim of ineffective assistance of counsel, Davis must show first that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2064. In prov-

ing that trial counsel was ineffective, Davis must overcome the "strong presumption" that trial counsel's conduct falls within the "wide range of reasonable professional assistance that 'might be considered sound trial strategy.'" *Brecheen,* 41 F.3d at 1365. It is essential to emphasize that petitioner's claim "must be reviewed from the perspective of counsel at the time," *Porter v. Singletary,* 14 F.3d 554, 558 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 532, 130 L.Ed.2d 435 (1994), because "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Finally, in reviewing a claim of ineffective assistance, the Court must "address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic,* 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984).

 "If constitutionally deficient performance is shown," *Brecheen,* 41 F.3d at 1365, then Davis must demonstrate that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." *U.S. v. Haddock,* 12 F.3d 950, 955 (10th Cir.1993). The second prong of the test requires that the Court evaluate the sentencing process in order to effectively analyze the prejudicial effects, if any, that trial counsel's performance played on the sentence rendered in the case. Addressing this specific issue, the Tenth Circuit has held:

> In the specific context of a challenge to a death sentence, the prejudice component of *Strickland* focuses on whether "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."

*Brecheen,* 41 F.3d at 1365 (citing *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. A verdict with overwhelming support in the record is less likely to have been affected by errors than one that is only weakly supported by the record. *Id.* at 696, 104 S.Ct. at 2069.

Davis argues that he was deprived of his Sixth Amendment Right to the effective assistance of counsel in the penalty phase of his case, and in the guilt phase as it bears upon the penalty phase. The Court finds that Davis' arguments fail to prove that Craig Truman's performance fell below the minimal constitutional standard. Therefore, Davis fails to pass the first prong of the test, and the second prong never needs to be examined.

## A. CLOSING ARGUMENT

Petitioner's first argument is that Craig Truman should be presumed ineffective due to a conflict of interest and due to the fact that he abandoned Davis during Truman's closing argument in the penalty phase. Davis asserts that Truman's actions effectively aided the prosecution. Specifically, petitioner argues that his counsel separated himself from his client by conveying to the jury in closing that he "hated" Davis, that he found him to be a liar, and that he dehumanized him by focusing on the reprehensible crime that his client had committed. In essence, Davis argues that defense counsel's conflict of loyalty resulted in Truman turning against him and unquestionably impacted his representation.

Davis argues that "prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. Davis alleges that Truman was "burdened by a conflict between the his client's interests and his own sympathies to the prosecution's position" and his own pride, and "effectively join[ed] the state in an effort to attain" the death sentence. *Osborn,* 861 F.2d at 629. As a consequence, petitioner asserts that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980).

 The Court rejects petitioner's argument on this issue. "Until a defendant

shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 350, 100 S.Ct. at 1719. The Court is unconvinced that Truman's tactics in closing provide evidence of an actual conflict of interest. Defense lawyers faced with difficult situations cannot later be faulted for using dramatic tactics during the closing argument. *Romero v. Lynaugh,* 884 F.2d 871, 877 (5th Cir.1989), *cert. denied,* 494 U.S. 1012, 110 S.Ct. 1311, 108 L.Ed.2d 487 (1990).

The Colorado Supreme Court concluded that, "[a]lthough Truman's choice of words was flamboyant and perhaps overdramatic at times, his closing statement, taken as a whole, conveyed several important messages to the jury about his client." *Davis III,* at 777. These messages included that counsel was asking for mercy in the face of overwhelming aggravating evidence against Davis, that the jury should consider the moral justification for imposing the death penalty in this case, that Davis should receive a penalty commensurate with the penalty given to Rebecca Fincham Davis, who was equally or more culpable in the crime, and that counsel was trying to maintain his credibility with the jury by not attempting to "twist or fudge anything." *Id.*

Much of Truman's decision was driven by Davis' own choice, against the advice of counsel, to take the stand and assume the sole responsibility for the murder. *See Foster v. Strickland,* 707 F.2d 1339, 1343–44 (11th Cir. 1983) ("Petitioner, who preempted his attorney's strategy choice, cannot now claim as erroneous the very defense he demanded [his attorney] present."). A defendant takes a substantial risk when he chooses to testify at his criminal trial. "[T]he defendant's testimony gives the jury an immediate and visible impression of him as a person, which may color their view of the entire case against him." *People v. Curtis,* 681 P.2d 504, 513 (Colo.1984). As the Colorado Supreme Court noted, "[T]he potential adverse consequences of testifying, which the defendant must accept as part of his *Curtis* decision, ... include any restrictions which such testimony may place upon the strategies available

to his or her counsel in presenting the defense." *Davis III,* 871 P.2d at 778.

■ Counsel's situation was made extremely difficult in this case not only by the exceptionally strong evidence offered by the prosecution, but by Davis' unpredictability and refusal to heed his attorney's advice. Therefore, making arguably derogatory statements about Davis and the crime for which he had already been convicted represented a reasonable tactical choice which conceded only those facts that were already overwhelming to the jury. Davis' counsel could hardly contest that a vile crime had been committed by a person with a violent history whose inherent dishonesty was highlighted by the obvious conflict between his own testimony and his attorney's opening statement. Truman did not abandon Davis. He made a tactical choice not to "burden ... [the jury] with the obvious" in order to avoid "the risk of losing them by arguing the absurd." *Romero,* 884 F.2d at 877. Instead, Truman vigorously pursued his best remaining option, that of "portray[ing] Davis as a person compelled to be untruthful by his manipulative ex-wife." *Davis III,* 871 P.2d at 778.

Considering the limited options remaining at the close of the sentencing phase of the trial, this Court concludes that Truman's closing argument was the product of sound trial strategy. Thus, Truman's representation of Davis at this stage of the proceeding did not fall below the constitutional standard set forth in *Strickland.*

## B. INVESTIGATION AND PRESENTATION OF MITIGATION EVIDENCE

Petitioner's next argument is that Truman's failure to sufficiently investigate all of the mitigation evidence available constitutes actual ineffectiveness. Davis claims that counsel failed to fully investigate his case and thus failed to present general mitigating evidence from family members, friends, former employers, prison personnel and other acquaintances. Petitioner further asserts that Truman failed to investigate and inform the jury of Davis' history of alcoholism, a 1965 closed-head injury, and sexual abuse he experienced as a child. Davis argued that the

jury was well aware of his dark side from the evidence presented at the guilt phase of the trial, and that the beneficial testimony that could have been presented by his family and friends far outweighed any negative impact.

■ "The failure to conduct a reasonable investigation into possible mitigating circumstances may render counsel's assistance ineffective." *Bolender v. Singletary,* 16 F.3d 1547 (11th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994). The Supreme Court set forth the standard for evaluating the investigative efforts undertaken by an attorney in *Strickland:*

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. Following this analysis, the Tenth Circuit Court of Appeals has held that this duty includes the responsibility of conducting some investigation into the defendant's background for possible mitigation evidence. *Brecheen,* 41 F.3d at 1366. Although "[t]he failure to conduct *any* investigation of a defendant's background may fall outside the scope of reasonable professional assistance," *Lightbourne v. Dugger,* 829 F.2d 1012, 1025 (11th Cir.1987) (emphasis added), "a defense attorney is not required to investigate all leads," *Bolender,* 16 F.3d at 1557, and "[c]ounsel has no absolute duty to present mitigating character evidence" at all. *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir. 1985). "After a sufficient investigation, ... 'counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.' A lawyer's election not to present mitigating evidence is

a tactical choice accorded a strong presumption of correctness, which is 'virtually unchallengeable.'" *Lightbourne,* 829 F.2d at 1025 (citations omitted).

Evidence exists in the record that Truman did conduct a limited investigation into mitigating evidence available prior to trial. Craig Truman testified extensively at the Rule 35(c) hearing, outlining the various pieces of background information he was provided and the different investigative avenues he pursued. What is clear from the record is that the information available, either from witnesses, from expert evaluations of the defendant, or from military, prison, and mental health records, would likely have been more damaging to Davis' mitigation case than beneficial.

Examples of potentially damning evidence abound in this case. At the Rule 35(c) hearing, Truman discussed a memorandum prepared by William Martinez, an investigator for the public defender who had originally represented the defendant in this case. The memorandum was given to Truman upon his appointment as Davis' counsel in December of 1986. The document indicated that the persons interviewed by Martinez, who were residents of the apartment complex managed by Davis and his wife, considered Davis to be extremely dishonest and prone to sexual misconduct, and that the interviewees thought that Davis should get the death penalty for his participation in the murder.

Truman made a conscious decision not to contact other potential character witnesses after discovering that those he did contact were likely to give testimony more damaging than helpful. For example, Davis' mother considered Davis an embarrassment to the family and no longer welcomed Davis in her home after his conviction for first degree sexual assault. Truman also learned that Wayne Gehrer, Davis' brother, had said that the murder of Virginia May was the "inevitable conclusion" of his brother's life story. Finally, Truman was aware that any positive testimony that could be given by Davis' ex-wife Leona Coates could be outweighed by the fact that Davis physically abused her and had at one time pointed a gun to her head during a disagreement over sexual matters.

Truman sought the assistance of a psychiatrist, Dr. Seymour Z. Sundell, in evaluating Davis for potential mitigating factors in his personality. Dr. Sundell spent nearly five hours conducting a psychological evaluation of Davis before reporting to Truman that Davis' history and background, including the defendant's history of alcoholism, was not useful in mitigation. Dr. Sundell also advised Truman that it was not his belief that Rebecca Fincham Davis was able to control Gary Davis.

Based on this information, Truman reasonably concluded that further investigation into petitioner's background would only lead to more damaging evidence that would provide additional support for the imposition of the death penalty. As the Colorado Supreme Court correctly noted, "Truman's reliance, in part, on the investigation and evaluation performed by Martinez and Dr. Sundell was entirely appropriate under the circumstance, particularly where the information obtained from those sources corroborated what Truman already knew about his client, that is, that Davis' family, friends and associates often had as much negative as positive to say about him." *Davis III*, 871 P.2d at 774. Defense counsel's strategic decision to forego further investigation of potential character witnesses was reasonable under the circumstances, given Truman's professional conclusion that pursuing such avenues would do more damage than good. *See Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066.

Davis asserts that Truman chose not to pursue other forms of mitigation during the sentencing phase of the trial. Specifically, Davis claims that Truman failed to provide the jury with information of a closed-head injury suffered by defendant in 1965. However, the record indicates that Truman was never informed of the injury by Davis. More importantly, "the trial court found no physical evidence of organic brain disease, nor any other evidence to support the defendant's theory that his prior brain injury would have been an effective mitigating factor." *Davis II*, 849 P.2d at 862.

Davis also contends that Truman failed to adequately investigate and present evidence of Davis' alcoholism in the sentencing phase.

Davis argues that a thorough investigation by defense counsel would have revealed the extent of Davis' disease and that expert testimony would have demonstrated that Davis was incapable of planning the kidnapping and murder due to his severe intoxication on the day Virginia May was killed. Truman's testimony at the Rule 35(c) hearing indicates that he considered and rejected this defense because, based on his experience as a defense attorney, the use of alcoholism as a mitigator had the potential to offend or even inflame some jurors. He further noted the difficulty in proving the defendant's intoxication at the time because Davis was not arrested for driving under the influence at the time he was initially stopped by Officer Lash shortly after the murder, and there were no physical or chemical tests performed to support the claim of intoxication.

This Court agrees with the Colorado Supreme Court in that "[t]he record leads us to conclude that Truman's decision not to present Davis' alcoholism as a mitigating factor was a reasonable tactical decision." *Davis III*, 871 P.2d at 775. *See also, Harich v. Dugger*, 844 F.2d 1464, 1472 (11th Cir. 1988), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989) (failure to present expert testimony on intoxication in the guilt/innocence phase of murder case not likely to have affected outcome of case because evidence that defendant was suffering from alcohol idiosyncratic intoxication at the time of the crime would have implicated him in the murder in contradiction of his own testimony).

Finally, Davis alleges that counsel should have presented evidence of early sexual abuse as a mitigating factor. However, the record indicates that Davis did not even want to discuss this issue with Truman, and certainly did not want it raised in open court. "[A] defendant's decision communicated to his counsel as to [what] he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of that investigation." *Tafero v. Wainwright*, 796 F.2d 1314, 1320 (11th Cir.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 782 (1987). A "strategy of silence"

on a particular issue may be adopted after a reasonable decision that an investigation into an issue would be fruitless. *Id.* In this instance, the Court finds that defense counsel's decision not to pursue this avenue was reasonable, not only because the defendant did not want to raise this issue at trial, but also because other courts have previously found that defendants beyond their early twenties cannot rely on events from their childhood for mitigation. *See, e.g., Francis v. Dugger,* 908 F.2d 696, 703 (11th Cir.1990) ("Given ... the fact that Francis was thirty-one years old when he murdered Titus Walters, evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight."); and *Francois v. Wainwright,* 763 F.2d 1188, 1190 (11th Cir.1985) (stay of execution denied, despite proffered mitigation evidence of abusive childhood, because defendant was 31 years old at time of murders and had previously been convicted of two felonies involving violence). At the time of his trial, Gary Davis was 42 years of age.

■ At trial, Truman chose to focus his mitigation efforts on the theory that Rebecca Fincham Davis was equally or more blameworthy than Davis, that she was the dominant figure in directing the murder of Virginia May, and thus that Davis should receive a sentence no more severe than his ex-wife. Truman sought to attack what, in his extensive experience, he saw as the weakest assertion of the prosecution's case in the penalty phase of the trial: that Davis deserved the death penalty because he was more culpable than Fincham. More importantly, there is substantial evidence in the record to support the theory that Fincham was the dominant actor, including Davis' pretrial statements to Truman, the testimony of Rebecca Fincham Davis that she did the talking for Davis when he applied for jobs or needed to cover up his drinking, testimony from other witnesses that she did all of the talking the night of the murder, and the fact that she sent a coercive letter to Davis a few days before the end of the sentencing phase of the trial which ultimately induced him to take the stand and assume all the blame himself. This strategy was eminently reasonable particularly in the context that developing the theory did not require the reliance on character evidence

from family members and other acquaintances or lengthy institutional and military records. In support of the theory, Truman presented character testimony from Father Sunderland and Lt. Donald Allen. Both witnesses offered "safe" testimony describing, respectively, Davis' feelings of remorse toward the May family and his good behavior while in prison, without opening the door to the more damaging character evidence that could have been brought to the jury's attention through other witnesses. *See Laws v. Armontrout,* 863 F.2d 1377, 1389–91 (8th Cir. 1988), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989) (mitigating evidence would have opened doors to damaging information, including war record, drug usage, prison record, and negative feelings of relatives).

Presenting testimony from family, friends, or other associates could have invited inquiry by the prosecution into Davis' history of violence towards his former wives, his vengeful motives behind the sexual assault of an adolescent girl, his general dishonesty and his sexual exploitativeness. Truman's strategy is further supported by his testimony at the Rule 35(c) hearing, at which he explained that he chose not to produce other character evidence so as not to undermine the theory. Given the situation counsel faced in the penalty phase of the trial, this Court finds that "[i]t was reasonable for defendant's counsel to conclude that the risk of potentially damaging character testimony outweighed the benefit of presenting evidence that defendant displays likeable characteristics to certain friends or family members." *Davis II,* 849 P.2d at 862. Thus, this Court finds that defense counsel's performance was not ineffective in the penalty phase of the trial.

### C. EVIDENTIARY HEARING AND PRESENTATION OF ADDITIONAL EVIDENCE

■ Petitioner alleged that he was entitled to an evidentiary hearing in federal court on his claim of ineffective assistance of counsel because he did not receive a full and fair evidentiary hearing in state court. *Dever v. Kansas State Penitentiary,* 36 F.3d

1531, 1535 (10th Cir.1994) (citing *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756–57, 9 L.Ed.2d 770 (1963)). Whether an evidentiary hearing is mandated in a habeas corpus proceeding pursuant to 28 U.S.C. § 2254 is a question of federal law. *Toler v. Wyrick*, 563 F.2d 372, 374 n. 2 (8th Cir.1977). A "federal district court need not hold an evidentiary hearing if the hearing in the state court was adequate to develop the facts." *Maxwell v. Turner*, 411 F.2d 805, 807 (10th Cir.1969). Even when the court finds that the facts were adequately developed at the state level, it retains "the power, constrained only by ... sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *Pagan v. Keane*, 984 F.2d 61, 64 (2nd Cir.1993) (citing *Townsend*, 372 U.S. at 318, 83 S.Ct. at 759–60). Although satisfied that an adequate record existed with which to evaluate petitioner's claim of ineffective assistance of counsel, this Court chose to exercise discretion pursuant to *Townsend* and grant Davis a limited evidentiary hearing. Additional evidence was also accepted in the form of affidavits, videotape depositions, and expert reports, in order to ensure that "a fundamental miscarriage of justice would [not] result from the denial of an evidentiary hearing in federal court." *McCann v. Armontrout*, 973 F.2d 655, 658 (8th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1342, 122 L.Ed.2d 724 (1993).

At the evidentiary hearing held on March 1, 1995, this Court heard limited testimony from a small number of Davis' family members. The Court also received and reviewed a large number of affidavits from potential mitigation witnesses, a report from an expert on alcoholism and a report from an expert on anti-social personality behavior, all submitted by petitioner prior to the oral arguments on ineffective assistance of counsel heard by the Court on April 13, 1995. Even with this additional evidence in the record, the Court finds that the likely impact such evidence would have had on the jury would have been minimal at best, and probably would have served to reinforce the jury's verdict.

During the evidentiary hearing, the Court heard direct testimony from Leona Coates, Davis' second wife, Janelle Caddick, Davis' step-daughter, and Brandon Gehrer and Casey Gehrer, Davis' son and step-son, respectively. Ms. Coates, while making it clear that she still had strong feelings for Davis, offered testimony that was equivocal and contradictory with previous statements given to the police at the time of Davis' arrest. She was also not clear that she would have made herself available to testify at the trial because she had moved out of state in order to protect her children from the publicity. Davis' three children would have had very little to offer at the trial. Although they each testified as to how important Davis was to them now, they could offer little testimony about the kind of father he had been. Davis spent four of the five years prior to the murder of Virginia May in prison. He did not see his children between the time he was released from prison and he was arrested for the murder. The only "fatherly" story that each child was able to relate was a well rehearsed anecdote about a family fishing trip which probably occurred before the two youngest children would have had any conscious memories.

■ The testimony of Davis' family was at best ambivalent and unpersuasive, but even if the testimony had convinced the Court that there was a good side to Davis, it would not have been enough to outweigh the extensive aggravating factors before the jury. *See Coleman v. Brown*, 802 F.2d 1227, 1235 (10th Cir.1986) ("[W]hen there is overwhelming evidence of both guilt and aggravating factors, testimony that the defendant is a 'good' person is unlikely to alter the outcome of a sentencing proceeding."). Armed with this insight, the Court finds that Truman's choice to not offer testimony from petitioner's family regarding his good character as a husband and father did not render his assistance ineffective at trial.

■ Petitioner also alleges that counsel was deficient for not interviewing Charles Ledbetter, Rebecca Fincham Davis' first husband, in order to better develop the theory that his ex-wife controlled Davis and manipulated him into murdering Virginia May. To evaluate the claim, the Court accepted the deposition testimony of Mr. Ledbetter over respondent's objection. After reviewing the

deposition, the Court is satisfied that the testimony of Mr. Ledbetter would not have aided Davis in any material way, and that Mr. Truman was not ineffective because he did not pursue this witness.

Petitioner submitted several additional affidavits from friends and family members, as well as videotape depositions from his parents and first wife. After fully reviewing the contents of all of the allegedly available testimony and considering the nature of the crime presented at trial, the Court finds that much of the information is cumulative, that it would have provided little help in Davis' case, and that it may have hurt him. *See DeLuna v. Lynaugh*, 873 F.2d 757, 759 (5th Cir.1989), *cert. denied*, 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 208 (1989) (demonstrating mitigation through testimony of family and friends "may well cause the jury to react unfavorably when it has the full knowledge of the brutal crime and the criminal's prior felonious record."). Thus, defense counsel cannot be found ineffective based on his refusal to parade a line of family, friends, and community members before the jury in the penalty phase of the trial. *See Laws v. Armontrout*, 863 F.2d at 1393 (experienced counsel could reasonably decide that jury would put little credence in the testimony of community members and therefore such testimony was "useless").

Finally, petitioner submitted evaluations from Dr. Gary Forrest on Davis' alcohol abuse, and from Dr. Chris Hatcher on Davis' anti-social personality traits. The Court has carefully reviewed the contents of each report, and finds that the evidence presented would have provided Davis with little assistance in the penalty phase, while at the same time opening a broader inquiry into the darker side of Davis' personality. *See DeLuna v. Lynaugh*, 873 F.2d at 758–59 (submitting evidence of prior substance abuse and other issues to jury may have destroyed any chance at convincing jury to return a life sentence); and *Laws v. Armontrout*, 863 F.2d at 1389 (presenting psychological history to jury might have shown that defendant was "a maladjusted man with a propensity for violence"). Therefore, counsel's perfor-

mance cannot be considered constitutionally deficient in this matter.

## III. REMAINING CONSTITUTIONAL ARGUMENTS

In his Petition For Writ Of Habeas Corpus, Davis included nine additional arguments which he contended should result in the reversal of his death sentence. The Court finds that the Colorado State Supreme Court thoroughly addressed the merits of his remaining arguments, or that they do not raise claims of federal constitutional merit, and therefore adopts the reasoning and the conclusion of the State Supreme Court as to those issues. For the reasons stated above, it is

ORDERED that petitioner's Petition For Writ Of Habeas Corpus is denied. It is

FURTHER ORDERED that the Court's Order of August 22, 1994, staying execution is vacated. It is

FURTHER ORDERED that this cause of action is dismissed with prejudice.