# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

**Patrick J.  Fisher, Jr.**
**Clerk**

**Elisabeth A. Shumaker**
**Chief Deputy Clerk**

November 14, 1996


**TO:**   All recipients of the captioned opinion

**RE:**   95-1285  Davis v. Executive Director
      November 13, 1996


Please be advised of the following correction to the captioned decision:

In the second full paragraph on page four of the opinion, "Colorado Court of Criminal Appeals" should read "Colorado Court of Appeals."

Please make the appropriate correction.

                    Very truly yours,

                    Patrick Fisher, Clerk



                    Susan Tidwell
                    Deputy Clerk

UNITED STATES COURT OF APPEALS

**Filed 11/13/96**

TENTH CIRCUIT

GARY LEE DAVIS,

Petitioner - Appellant,

v.

No. 95-1285

EXECUTIVE DIRECTOR OF
DEPARTMENT OF CORRECTIONS, as
head of the Department of Corrections,
Ari Zavaras,

Respondent - Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 94-Z-1931)**

Vicki Mandell-King, Assistant Federal Public Defender, Denver Colorado; and
Dennis W. Hartley, Colorado Springs, Colorado (Michael G. Katz, Federal Public
Defender, Denver, Colorado, with them on the briefs), for Petitioner - Appellant.

Robert M. Petrusak, Senior Assistant Attorney General, Denver, Colorado; and Steven
Bernard, Adams County Attorney's Office, Brighton, Colorado (Gale A. Norton,
Attorney General, with them on the brief), for Respondent - Appellee.

Before **ANDERSON**, **BALDOCK**, and **HENRY**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Gary Lee Davis appeals from the district court's denial of his first petition for a writ of habeas corpus, in which he seeks to overturn his sentence of death. We granted Mr. Davis's request for a certificate of probable cause and a stay pending appeal.[1] We hold as follows: (1) Mr. Davis was not abandoned by his attorney in the closing argument of the penalty phase of his trial; (2) Mr. Davis suffered no prejudice from his attorney's failure to pursue and present certain additional mitigating evidence in the penalty phase; (3) the statutory aggravators presented to the jury were either valid or, if invalid or otherwise erroneously submitted to the jury, were harmless; (4) the penalty phase jury instructions neither misled nor confused the jury concerning its evaluation of mitigating evidence; and (5) no error occurred in the removal for cause of three prospective jurors. We therefore affirm the denial of Mr. Davis's habeas petition.

---

[1]While this appeal was pending, after all briefs had been filed, President Clinton signed into law the "Antiterrorism and Effective Death Penalty Act of 1996," Pub. L. No. 104-132, 110 Stat. 1214. This Act substantially amends habeas corpus proceedings. At oral argument, both parties averred that the new Act does not apply to this proceeding. In particular, the state affirmatively waived its application in this proceeding. Cf. Emerson v. Gramley, 91 F.3d 898, 900 (7th Cir. 1996) (holding that state had waived issue of the Act's possible bearing on the appeal because it failed to argue it). The state has expressly stated, however, that it does not waive its application to Mr. Davis in any future proceeding.

**BACKGROUND**

In July 1986, in Byers, Colorado, Gary Davis and his then-wife, Rebecca Fincham Davis, kidnaped, sexually assaulted and murdered Virginia May. Mr. Davis has never challenged his conviction for that crime, nor does he dispute his involvement in it. The tragic facts concerning this crime have been fully set out in the state court opinions affirming Mr. Davis's conviction and sentence on direct appeal and in state post-conviction proceedings. People v. Davis, 849 P.2d 857 (Colo. Ct. App. 1992) (Davis II), aff'd, 871 P.2d 769 (Colo. 1994) (Davis III); People v. Davis, 794 P.2d 159 (Colo. 1990) (Davis I), cert. denied, 498 U.S. 1018 (1991). We refer to facts concerning the crime only as necessary in our discussion of particular issues.

Mr. Davis and Ms. Fincham were tried separately. The state sought the death penalty against Mr. Davis but not Ms. Fincham. When Mr. Davis's appointed state public defender had to withdraw because of a conflict of interest, Craig Truman was appointed Mr. Davis's counsel. Against Mr. Truman's advice, Mr. Davis testified before the jury during the guilt/innocence phase of the trial, stating that he had kidnaped, assaulted and murdered Ms. May, and emphasizing his own culpability over that of Ms. Fincham. The jury found Mr. Davis guilty of murder in the first degree after deliberation; felony murder; conspiracy to commit murder in the first degree; second degree kidnaping; and

-3-

conspiracy to commit second degree kidnaping. He was sentenced to life imprisonment on the conspiracy and second degree kidnaping convictions.[2]

The penalty phase for the murder convictions began the day after the guilt/innocence phase concluded. The jury was presented with six aggravating factors and eight mitigating factors. It found all six aggravating circumstances proven and made no findings on the existence of any mitigating factors. The jury concluded beyond a reasonable doubt that death was the proper punishment.

In his direct appeal, Mr. Davis challenged his sentence on numerous grounds. The Colorado Supreme Court affirmed the sentence, with three justices dissenting. Davis I. Mr. Davis then filed a motion for post-conviction relief, arguing that Mr. Truman provided ineffective assistance of counsel during the penalty phase of the trial. Mr. Davis sought additional time to investigate this claim of ineffectiveness. The court conducted a hearing, after which it denied his ineffectiveness claim. The Colorado Court of Criminal Appeals affirmed, with one judge dissenting, Davis II, and the Colorado Supreme Court affirmed. Davis III.

After exhausting state remedies, Mr. Davis brought this federal habeas petition arguing: (1) Mr. Truman rendered ineffective assistance of counsel during the penalty phase because he (a) abandoned Mr. Davis in his closing argument; and (b) failed to

_____

[2]Mr. Davis was also charged with being an habitual offender, based on four prior convictions. He pled guilty to this charge on the same day the jury returned a guilty verdict.

-4-

conduct adequate investigation into, and failed to present, mitigating evidence in Mr. Davis's background; (2) the jury was permitted to consider unconstitutional statutory aggravators; (3) various errors occurred in the penalty phase instructions; and (4) the trial court erroneously excluded three prospective jurors because of their stated qualms about the death penalty. The district court denied his habeas petition. Davis v. Executive Dir., 891 F. Supp. 1459 (D. Colo. 1995). Mr. Davis appeals.

## DISCUSSION

We review de novo the district court's legal conclusions in dismissing a petition for a writ of habeas corpus. Harvey v. Shillinger, 76 F.3d 1528, 1532 (10th Cir. 1996), cert. denied, 1996 WL 455500 (U.S. Oct. 7, 1996) (No. 96-5493). We review the district court's factual findings for clear error. Edens v. Hannigan, 87 F.3d 1109, 1113-14 (10th Cir. 1996). State court factual findings are presumptively correct and are therefore entitled to deference. Medina v. Barnes, 71 F.3d 363, 369 (10th Cir. 1995); 28 U.S.C. § 2254(d).

### I. **Effective Assistance of Counsel.**

### A. **Abandonment:**

Mr. Davis first argues that his attorney, Mr. Truman, effectively abandoned him during closing arguments in the penalty phase of his trial, thereby leaving him without

counsel at all. The obligation to provide effective assistance of counsel extends to a capital sentencing hearing. Brecheen v. Reynolds, 41 F.3d 1343, 1365 (10th Cir. 1994), cert. denied, 115 S. Ct. 2564 (1995). "A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest," and thereby fails to provide effective assistance. Osborn v. Shillinger, 861 F.2d 612, 629 (10th Cir. 1988). Usually, when a defendant claims ineffective assistance of counsel because his attorney's performance was inadequate, he must show both constitutionally deficient performance and that he was prejudiced by his attorney's errors. Brecheen, 41 F.3d at 1365. In the event of an actual conflict of interest occasioned by abandonment, prejudice is presumed. Osborn, 861 F.2d at 626; see also United States v. Williamson, 53 F.3d 1500, 1510-11 (10th Cir.), cert. denied, 116 S. Ct. 218 (1995); Brecheen, 41 F.3d at 1364 n.17.[3]

---

[3]The presumption of prejudice is based upon language from United States v. Cronic, 466 U.S. 648 (1984), in which the Supreme Court observed that, in the unusual case where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," prejudice is presumed. Id. at 659. Examples of such failure include "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding," id. at 659 n.25, or where a defendant is denied the right to effectively cross-examine a witness. Id. at 659. The Court specifically observed, however, that it is only in a narrow class of cases that prejudice will be presumed: "[a]part from circumstances of that magnitude . . . there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." Id. at 659 n.26.

Other courts have been reluctant to apply the Cronic exception broadly. See, e.g., Scarpa v. Dubois, 38 F.3d 1, 11-15 (1st Cir. 1994) (discussing cases), cert. denied, 115 S.

<span style="float:right">(continued...)</span>

Mr. Truman began his closing argument in the penalty phase with the following:

> Now it's my turn to come and ask you for Gary Davis's life. That's what I'm here to do. For 14 long years I have practiced law in these criminal courts and up and down these mean halls. You think you have seen just about everything. You think you have seen everything once. I have never seen a case like this. I never have, and I hopefully never will.

R. Vol. V, Vol. 33 at 51. He went on to state:

> There are times in this case that I hate Gary Davis, I am going to tell you that, and I think you know it. There are times I hate the things that he has done, and I have told him, and I tell you, there's no excuse for it. There's no excuse for it whatsoever.
>
> In the times that we have seen these cases come and go, they get worse and worse instead of better, and I'm not kidding anybody, this is one of the worst ones I have ever seen or heard of. I can't recall a case where I have never made a closing argument, and I can't recall a case where we have spoken as little to you as we have this one, and there's a reason for it. That reason is that in December, when I first saw Gary Davis, I knew that sometime or other I was going to be standing here asking for 12 people's mercy. That's all he has got. That's all we can seek. . . . I, too, think killing is wrong, and it's killing, whether it's the state, and it's killing, whether it's Gary Davis. . . . It says, "Thou shalt not kill," and if I or you . . . or anybody who was there, and if Ginny May would have lived -- she didn't, she died -- and if I thought -- if I thought that Brandon and Krista May would have five seconds of peace by Gary Davis's death, I would choke the life out of him right now, and he knows it, but it won't help. . . .
>
> Some of the times I hate Gary Davis is because of what he has done to me. I have been on this case since December, when the public defender got off. The public defender got off because of Gary Davis's lies, and Gary Davis has lied to me. Gary Davis set up the public defender for failure. In

---

[3](...continued)
Ct. 940 (1995). The Scarpa court described our decision in Osborn as an "isolated case[]." Id. at 5; see also Toomey v. Bunnell, 898 F.2d 741, 744 n.2 (9th Cir.) ("We have applied the Cronic exception very sparingly."), cert. denied, 498 U.S. 960 (1990).

-7-

a lot of respects he set me up for failure. I guess I'm too prideful, worried about my reputation. Maybe that's why I hated him the other day.

Id. at 51-53. Mr. Truman then discussed at some length the relationship between Mr. Davis and Ms. Fincham, reiterating the theme of the guilt/innocence phase of the trial, that Ms. Fincham was the more culpable of the two. Mr. Truman told the jury:

> As bad as Gary Davis is -- and you won't hear me say otherwise -- there's someone equally as bad, maybe worse. That someone continues to lie. . . . Anything to save Becky Davis [Fincham]. That demonstration alone, of watching him testify, I submit to you shows who's wearing the pants in this family. I'm not saying that forgives Gary Davis. Nothing forgives Gary Davis. He deserves to get what she got. Sauce for the goose is sauce for the gander. They're in the same position, I submit to you, and I submit to you that both ought either to look at the gas chamber, or both ought to spend the rest of their lives in the penitentiary.

Id. at 55. He concluded with the following:

> I have never had a case like this before, and I have never been able not to talk to juries, as I almost wasn't able to talk to you at the start. I guess I'm a prideful man. I have been doing this a long time and I think I'm good at it, and I haven't said anything during this trial and I have watched you, some of you looking at me, wondering, when are you going to get started? When are you going to start representing your client? When are you going to get up? I have seen that in your eyes. I know what you mean. You can't change what's happened and I am not going to twist or fudge anything for you. Now's the time for me to be heard. Now's the time I'm talking to you, and each one of you has it in your hand to spare Gary Davis or to kill him, for if one of you says no, stop the killing, there's been too much, that's the way it will be. And if all of you believe that the only thing for Gary Davis is to put him in the gas chamber, drop those pellets into the cyanide bath, watch him choke to death, that's what will happen.
>
> Is there a man so bad that he's irredeemable? That's the question here. There's no question about what happened. It's a question about what's going to happen. I have never begged a jury before for anything, but I'm begging you now, and I am asking you please not to kill Gary Davis.

Id. at 56.

Mr. Davis relies heavily on our decision in Osborn, calling this case "virtually indistinguishable" from Osborn, in which we held that the defendant's attorney at the sentencing hearing "so abandoned" his duty to advocate on behalf of his client "that the state proceedings were almost totally non-adversarial." Osborn, 861 F.2d at 628. Among the statements and actions upon which we based that conclusion were the following: "Osborn's counsel made statements to the press indicating that Osborn had no evidence to support his claims" and "although counsel knew or should have known that the prosecutor's office had conveyed ex parte information to the sentencing court, counsel never sought to discover its contents or counteract its effect." Id. Moreover, the district court described the attorney's arguments at the sentencing phase as follows:

> Counsel's arguments at the sentencing hearing stressed the brutality of the crimes and the difficulty his client had presented to him. At the beginning of the hearing, counsel referred to the difficulty of presenting mitigating circumstances when evidence against a client is overwhelming. In closing, counsel referred to the problems Osborn's behavior had created for counsel throughout the representation. Counsel described the crimes as horrendous. He analogized his client and the co-defendants to "sharks feeding in the ocean in a frenzy; something that's just animal in all aspects."

Id. (quoting Osborn v. Shillinger, 639 F. Supp. 610, 617 (D. Wyo. 1986), aff'd, 861 F.2d 612 (10th Cir. 1988)). We concluded that Osborn's attorney did more than "make poor strategic choices;" rather, "he acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." Id. at 629.

In our view, Mr. Truman's closing argument did not constitute abandonment of Mr. Davis, such that the adversarial process was undermined.[4] As the district court observed, Mr. Truman was placed in a very difficult position because of Mr. Davis's own decision, against Mr. Truman's advice, to testify at the end of the guilt/innocence phase of the trial and take full responsibility for the crime, contrary to the strategy, pursued up to that point, of portraying Mr. Davis as less culpable than Ms. Fincham. That testimony made it even more difficult to explain why Mr. Davis did not deserve the death penalty, while maintaining credibility with the jury.

Moreover, while Mr. Truman expressed in general terms how horrible the case was -- "one of the worst ones I have ever seen" -- and expressed his hatred of Mr. Davis and his crimes, that is significantly different from "stress[ing] the brutality of the crimes . . . . describ[ing] the crimes as horrendous . . . [and] analogiz[ing] his client and the co-defendants to 'sharks feeding in the ocean in a frenzy; something that's just animal in all aspects.'" Osborn, 861 F.2d at 628 (quoting Osborn, 639 F. Supp. at 617)). Mr. Davis has never disputed that he participated in a crime which was undeniably horrific.

Mr. Truman's statements about Mr. Davis's lies, to him and to others, while blunt and unflattering to Mr. Davis, were in part a response to Mr. Davis's decision to testify. His testimony itself, which completely undermined the strategy pursued by Mr. Truman,

---

[4]The Colorado Supreme Court described it as "flamboyant and perhaps overdramatic at times." Davis III, 871 P.2d at 777.

-10-

with Mr. Davis's apparent approval, revealed the obvious: that Mr. Davis had been at least deceptive towards Mr. Truman. Mr. Truman's remarks were at least an attempt to cast doubt on the veracity of Mr. Davis, who had just testified in a manner virtually guaranteed to condemn him to a sentence of death.

Furthermore, a substantial portion of the closing argument was devoted to stressing the deceptiveness of Ms. Fincham and her control over Mr. Davis, and suggesting that Mr. Davis's testimony accepting full responsibility for the crime was yet another example of that control. Mr. Truman emphasized that Mr. Davis should receive the same sentence as Ms. Fincham, who had been sentenced to life imprisonment. This was a reiteration of the "equal justice" defense pursued throughout the trial, but substantially undermined by Mr. Davis's testimony. That had always been the most viable strategy for Mr. Davis to avoid the death penalty, and Mr. Truman effectively pursued it again in closing argument.

Finally, Mr. Truman closed his argument with a plea for Mr. Davis's life: "I have never begged a jury before for anything, but I'm begging you now, and I am asking you please not to kill Gary Davis." R. Vol. V, Vol. 33 at 56. That was a powerful plea, coming from a man who had just expressed his own dislike of Mr. Davis and his crime.

In sum, this case is distinguishable from <u>Osborn</u>, both because the actual closing argument in this case was qualitatively different and because the circumstances of this case left Mr. Truman with little room to maneuver. We therefore hold that Mr. Davis was not abandoned by Mr. Truman in his closing argument.

**B. Presentation of Mitigating Evidence:**

Mr. Davis also argues that Mr. Truman was ineffective in failing to adequately investigate potential evidence in mitigation and in failing to present certain mitigating evidence which was available. To establish ineffective assistance of counsel, a defendant "must first show that counsel 'committed serious errors in light of "prevailing professional norms"'" in that the representation fell below an objective standard of reasonableness." Brecheen, 41 F.3d at 1365. See Strickland v. Washington, 466 U.S. 668, 688 (1984). There is a "strong presumption" that counsel has acted reasonably and represented his client effectively. Id. at 689. We review an attorney's performance with substantial deference. Id.; see also Brecheen, 41 F.3d at 1365; Stafford v. Saffle, 34 F.3d 1557, 1562 (10th Cir. 1994), cert. denied, 115 S. Ct. 1830 (1995).

Once a defendant has shown constitutionally deficient performance, he must demonstrate prejudice from that performance. The defendant bears the burden of proving both deficient performance and prejudice. Brecheen, 41 F.3d at 1365. We review an ineffectiveness claim de novo, as it presents a mixed question of law and fact. Brewer v. Reynolds, 51 F.3d 1519, 1523 (10th Cir. 1995), cert. denied, 116 S. Ct. 936 (1996). We review the district court's factual findings for clear error. Id.

In some cases, we proceed directly to the issue of prejudice: "[t]he Supreme Court has observed that often it may be easier to dispose of an ineffectiveness claim for lack of prejudice than to determine whether the alleged errors were legally deficient." United

-12-

States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993); see also Strickland, 466 U.S. at 697; Brewer, 51 F.3d at 1523; United States v. Smith, 10 F.3d 724, 728 (10th Cir. 1993). This is such a case. We accordingly express no opinion on whether Mr. Truman's performance was deficient.[5]

To establish prejudice under Strickland, Mr. Davis must show there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; Brewer, 51 F.3d at 1523. As applied to the penalty phase of a capital case, a petitioner alleging prejudice from counsel's ineffectiveness must show "a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. We must "keep in mind the strength of the government's case and the aggravating factors the jury found as well as the mitigating factors that might have been presented." Stafford, 34 F.3d at 1564; see also Brewer, 51 F.3d at 1523.

Mr. Davis's specific allegations of error are that Mr. Truman: (1) failed to contact to solicit information and possible testimony from family members, including Tonya

---

[5]The district court held that Mr. Truman's performance was not constitutionally deficient, and accordingly never reached the prejudice prong of Strickland.

-13-

Tatem, Mr. Davis's first wife; Glenn Davis, a stepbrother; Adeline Davis, Mr. Davis's mother; and Mr. Davis's children and stepchildren;  (2) failed to follow up and pursue initial cursory contacts with Mr. Davis's brother, Wayne Gehrer, and with Mr. Davis's second wife, Leona Coates; (3) failed to adequately investigate and present expert testimony on Mr. Davis's alcoholism; (4) failed to explore Ms. Fincham's psyche, personality and background, including contacting her first husband, Charles Ledbetter, and presenting expert testimony from Dr. Chris Hatcher, a psychologist who was an expert on relative accomplice liability; (5) failed to contact and adequately develop possible testimony from former employers and acquaintances, including people who lived in the same apartment complex as the Davises; and (6) failed to present favorable prison records from which mitigating evidence might have been derived.  Mr. Davis argues that, had the jury heard all of this evidence, it would have viewed him in a different light and probably sentenced him to life imprisonment rather than death.

### 1. **Family Members**:

Mr. Davis argues Mr. Truman failed to follow up on initial contacts with Mr. Davis's brother, Wayne Gehrer, and with Mr. Davis's second wife, Leona Coates, as well as failing to contact at all his first wife, Tonya Tatem, his children and stepchildren, his stepbrother, and his mother.  Investigator William Martinez had prepared a report for Mr. Truman's office, detailing his investigation, conducted in July 1986, into Mr. Davis's

background.  It includes a description of a conversation with Wayne Gehrer, in which Mr. Gehrer described Mr. Davis as "always a little bit different, devil-may-care type attitude, always had an alcohol problem."  R. Vol. II, Doc. 54, tab 20.  Mr. Martinez's report indicates "[w]hen asked how he felt about the homicide and about Gary and what he thought of it, his (almost quote) words were -- it was the inevitable conclusion to his life's story."  Id.  That assessment of Mr. Davis was not likely to be viewed by the jury as mitigatory; rather, it suggests he was a reckless and irresponsible man, whose life story was appropriately concluded by the tragic murder of Ms. May.  Further discussion with Mr. Gehrer was likely to produce evidence at least as damaging, perhaps more so, than helpful to Mr. Davis.  Mr. Davis thus suffered no prejudice from Mr. Truman's failure to call Wayne Gehrer to testify in the penalty phase of the trial.

Mr. Davis similarly challenges Mr. Truman's failure to pursue Leona Coates as a possible mitigation witness.  At the time of Mr. Davis's trial, she had been interviewed by another investigator, Sherry Garner, to whom Ms. Coates stated that Mr. Davis had a drinking problem and that there "were times that he was violent with [her.]"  Statement of Leona Coates dated 8/7/86, R. Vol. VI.  Additionally, she stated that Mr. Davis pointed a rifle at her head one time, and tried to choke her twice.  Id.  When she testified, nine years later, in Mr. Davis's habeas proceeding, she stated that Mr. Davis was never violent towards her, that the gun to which she referred in 1986 was a plastic gun, and that she was "under a lot of pressure" in 1986 when she gave the statement about the gun being

-15-

held to her head. R. Vol. X at 88. The district court described that testimony as "equivocal and contradictory with previous statements given to the police at the time of Davis' arrest." Davis, 891 F. Supp. at 1468. The court further observed that Ms. Coates was "not clear that she would have made herself available to testify at the trial because she had moved out of state in order to protect her children from the publicity." Id. Given the damaging nature of her statements about Mr. Davis in 1986, as well as the uncertainty as to whether she would even have been available to testify, we see no prejudice to Mr. Davis from Mr. Truman's failure to call her as a mitigation witness.

Mr. Davis also argues he suffered prejudice from the failure to procure testimony from Tonya Tatem, his children and stepchildren, his mother, and a stepbrother. He argues they would have testified about his troubled childhood, his passivity and tendency to be a follower, his devotion to his children, and his recurrent problems with alcohol. The district court responded to this argument as follows: "[p]resenting testimony from family, friends, or other associates could have invited inquiry by the prosecution into Davis' history of violence towards his former wives, his vengeful motives behind the sexual assault of an adolescent girl, his general dishonesty and his sexual exploitativeness." Davis, 891 F. Supp. at 1467.[6] For the following reasons, we agree

---

[6]The reference to the sexual assault of an adolescent girl describes an incident which occurred in 1982 and resulted in Mr. Davis's conviction for first-degree sexual assault. He was convicted of sexually assaulting the 15 year old daughter of a friend of Leona Coates, his second wife.

with the district court that such testimony was as likely to open the door to damaging evidence as it was to helpful evidence.

Tonya Tatem's affidavit and deposition testimony both described Mr. Davis as a loving and good husband, when he was not drinking. Both also described him as increasingly abusive when drinking. Again, the potentially positive effect of such testimony on the jury is offset by the potentially negative effect of a description of a man who routinely became abusive towards his spouse when drinking, and whose drinking ultimately destroyed their marriage.

Various of Mr. Davis's children and stepchildren testified, either at the habeas hearing or by way of affidavit. Their testimony recalled vague general childhood memories of Mr. Davis as a loving father, as well as more detailed accounts of how he has reestablished his relationship with them since his imprisonment for the murder of Ms. May, and how he is currently helping them. The district court described the direct testimony of three of Mr. Davis's children as follows:

> Davis' three children would have had very little to offer at the trial. Although they each testified as to how important Davis was to them now, they could offer little testimony about the kind of father he had been. Davis spent four of the five years prior to the murder of Virginia May in prison. He did not see his children between the time he was released from prison and he was arrested for the murder. The only "fatherly" story that each child was able to relate was a well rehearsed anecdote about a family fishing trip which probably occurred before the two youngest children would have had any conscious memories.

Id. at 1468. We agree with the district court's characterization of that testimony, noting that the district court, not we, was in the position to evaluate the credibility of those witnesses. Their testimony about Mr. Davis, both at the hearing and by way of affidavit, concerning his character prior to and at the time of the murder was, of necessity, vague and non-specific, simply because they were either fairly young and/or Mr. Davis had spent little time with them. Their testimony about their relationship with him now, and since his conviction and sentence for the May murder, is less significant. We conclude that such testimony would have had very little impact on the jury in this case.

Finally, Mr. Davis argues that Mr. Truman should have presented testimony from Glenn Davis, the stepbrother to whom Mr. Davis was closest, as well as from Mr. Davis's mother. Glenn Davis's deposition portrays Mr. Davis as a passive follower, but concedes that, if drunk, he might be capable of committing a crime like the murder of Ms. May: "I will say that for him to do that he had to be drunk. . . . [I]f he was sober and wasn't drinking that night, in my belief I don't think Gary would have gone along with it." Glenn Davis Dep. at 24, R. Vol. IX. Mr. Davis's mother, Adeline Davis, was not contacted for possible testimony at the time of Mr. Davis's trial, partially because Wayne Gehrer told Investigator Martinez that Mr. Davis's parents were experiencing poor health, and he worried that contacting them to testify on their son's behalf might worsen their health. Adeline Davis's deposition confirms that she was experiencing severe health problems in 1986 and 1987. Additionally, Mr. Truman testified, at the hearing on the

Rule 35(c) motion, that he was aware that after Mr. Davis's conviction and imprisonment for first-degree sexual assault of the 15-year-old, "his mother indicated that he was no longer welcome at their home and that he was an embarrassment to the family." R. Vol. IV, Vol. 40 at 50.[7]

In sum, we agree with the district court that a decision to present mitigation testimony from family members was fraught with peril, because Mr. Davis's background contained numerous instances of conduct that was more likely to make a jury feel unsympathetic towards him, than sympathetic towards him. See Brewer, 51 F.3d at 1527 ("[W]hile testimony from a family member may generally be beneficial to a capital defendant at sentencing, we believe that, in this case, the totality of [the family member's] revelations could have been devastating."). The Colorado Supreme Court correctly concluded that "[t]he testimony of such witnesses, if presented, would have constituted, in Truman's own words, 'a two-edged sword' at best." Davis III, 871 P.2d at 774. We therefore conclude that he suffered no prejudice from the failure to present such testimony.

2. **Expert Testimony:**

---

[7]In her deposition taken in 1995, Mrs. Davis did not recall making such a statement. Apparently, this statement was conveyed to Mr. Truman through Wayne Gehrer, Mr. Davis's brother. The Colorado Supreme Court found that Mr. Truman was aware of Mrs. Davis's embarrassment. Davis III, 871 P.2d at 773-74.

Mr. Davis also argues that he was prejudiced by the failure to investigate and present expert testimony on the nature and effects of Mr. Davis's severe alcoholism, as well as on the relationship between Mr. Davis and Ms. Fincham. At the time of the trial, Mr. Truman sought the assistance of a psychiatrist, Dr. Seymour Z. Sundell. After examining Mr. Davis, Dr. Sundell concluded that Mr. Davis's history and background, including his history of alcoholism, were not useful in mitigation.[8]

Mr. Davis introduced in his federal habeas proceeding reports by Dr. Gary Forrest, an expert on the effects of alcoholism, and by Dr. Chris Hatcher, an expert on relative accomplice liability. He claims comparable reports should have been submitted in the penalty phase of his trial, and that the failure to do so prejudiced him. Dr. Forrest's report described Mr. Davis as "clearly a chronic alcoholic with a concurrent personality disorder" and further opined that "it is highly probable that Mr. Davis was both intoxicated and mentally impaired when Virginia May was murdered." Pet'r's Ex. No. 111, Appellee's Addendum. Aside from the fact that the report itself contains some

---

[8]Dr. Sundell provided an affidavit in 1995, in connection with Mr. Davis's federal habeas proceeding. In that affidavit, he explained his conclusion reached in 1986 and 1987: "Mr Truman requested that I do a clinical evaluation of Mr. Davis, for purposes of determining competency to stand trial, existence of any defenses to the crime, and any psychiatric disorder which could constitute a statutory mitigator in the death penalty phase of the case." Sundell Aff. ¶ 3, R. Vol. IX. Dr. Sundell further explained that his diagnosis was medical, not behavioral, and "did not in itself preclude further investigation by Mr. Truman along the lines of general mitigation." Id. at ¶ 8.

descriptions of Mr. Davis that might not evoke sympathy at all from a jury,[9] the mitigatory thrust of Dr. Forrest's report -- that Mr. Davis was both intoxicated and mentally impaired when Ms. May was murdered -- was undermined by the fact that there was no actual evidence of intoxication when the Davises were first stopped by police on the road, following the murder, as well as by Mr. Davis's own testimony in which he specifically recalled the murder and his involvement in it.[10]  Moreover, the jury already knew that Mr. Davis had a drinking problem, and that he had been drinking the day of the murder.  Thus, Dr. Forrest's conclusions in his report would have either been unsupported

---

[9]For example, Dr. Forrest includes in his overall clinical profile of Mr. Davis that he demonstrates "manipulation ('conning'), . . . sexual promiscuity, irresponsibility, . . . [and] hostility and anger control problems."  Using a different evaluative tool, Dr. Forrest observed that "Mr. Davis's sexuality and sensuality drives may be fused with hostility."  Pet'r's Ex. No. 111, Appellee's Addendum.

[10]As the district court pointed out, Dr. Forrest's and Dr. Hatcher's reports were inconsistent on the issue of Mr. Davis's mental state the day of the murder.  In Dr. Forrest's report, Mr. Davis reported that he was in an alcoholic black-out the day of the murder, while in Dr. Hatcher's report, Mr. Davis was able to recall details of the day and of the murder.

Officer Reedy Lash, accompanied by Ms. May's husband, initially stopped the Davises in their car some four hours after the murder occurred.  Officer Lash briefly questioned the Davises concerning Ms. May, but did not arrest them at that time.  He testified that Mr. Davis did not appear to be under the influence of alcohol at that time.  R. Vol. V, Vol. 24 at 91-92.  Furthermore, no roadside sobriety tests were done, and there was therefore no actual evidence at all concerning Mr. Davis's physical and mental state at or near the time of the murder.  See Davis II, 849 P.2d at 862.  This circumstance renders any argument about whether Mr. Davis was actually intoxicated or mentally impaired at the time of the murder purely speculative.

by direct evidence at the time of the murder, or would have been duplicative of other evidence already before the jury.[11]

Mr. Davis further argues that, besides Dr. Forrest's expert report and testimony, Mr. Truman should have more generally explored Mr. Davis's alcoholism as a mitigating circumstance. Mr. Truman testified in the Rule 35(c) proceeding that one reason he declined to explore alcoholism as a mitigator is because the jury might have reacted negatively to the fact that Mr. Davis had been treated numerous times for alcoholism. See Jones v. Page, 76 F.3d 831, 846 (7th Cir. 1996) (noting that failure to introduce evidence of petitioner's long history of substance abuse "was a reasonable tactical choice because such evidence was a 'double-edged sword,' that is, it could easily have been considered either aggravating or mitigating evidence"), petition for cert. filed, (U.S. June 28, 1996) (No. 96-5064). We agree that it is just as likely the jury would react negatively to Mr. Davis's repeated failures to effectively address his alcoholism.

Similarly, Dr. Hatcher's report examines in considerable detail the history of the relationship between Mr. Davis and Ms. Fincham. He draws the conclusion that the evidence leads to "serious questions as to who was the dominant individual in the commission of this abduction/homicide." Pet'r's Ex. No. 112, Appellee's Addendum. However, any implication or persuasive suggestion that Ms. Fincham was the dominant

---

[11]The district court refused to admit a supplemental report of Dr. Forrest, which responded to a series of questions posed by Mr. Davis's counsel. We find no error in the refusal to admit the supplemental report.

actor in the crime was wholly undermined by Mr. Davis's own statement that he was the

main actor and that Ms. Fincham was much less culpable. Even if Dr. Hatcher's report

permits the inference that Mr. Davis was simply lying when he testified against himself,

the jury was nonetheless confronted with that clear testimony, under oath, in which Mr.

Davis recounted the crime in a manner completely contrary to the way Dr. Hatcher's

report suggests the crime occurred.[12] It is important to note that the jury was able to

evaluate Mr. Davis's credibility and demeanor when he testified, as we, an appellate

court, cannot. They were further able to evaluate his credibility in context -- that is,

having observed him sitting in the courtroom throughout the duration of his trial. We

therefore cannot conclude that there is a reasonable probability that, were those two

expert reports presented to the jury, the jury would have concluded that death was not the

appropriate sentence.

### 3. Other Acquaintances:

---

[12]Moreover, Dr. Hatcher's report itself describes Mr. Davis as "physically and verbally aggressive" in his relationships. It also details his criminal history, which includes arrests and convictions for theft, burglary, felony menacing (in which Mr. Davis asked a convenience store clerk to come outside the store to help him open an ice machine, at which time Mr. Davis held a knife to her neck and dragged her down an alley, during which the clerk's throat was slightly cut), and first-degree sexual assault of a 15 year-old girl, prior to his participation in Ms. May's murder. Pet'r's Ex. No. 112, Appellee's Addendum. The jury would surely have observed the increasing violent nature of Mr. Davis's conduct. This would hardly have struck a sympathetic chord with them. See Brewer, 51 F.3d at 1527 ("The jury undoubtedly would have been struck, as we are, by Mr. Brewer's escalating criminality.").

Mr. Davis also asserts he suffered prejudice from Mr. Truman's failure to call other mitigation witnesses, such as people who lived for awhile in the same apartment building as the Davises, and the Davises' employer. Such evidence was, however, either as likely to harm as help Mr. Davis in front of the jury, or was also directed at showing that Ms. Fincham was the dominant figure in the Davis relationship, and by implication the dominant figure in the murder, a proposition which Mr. Davis's own testimony effectively rebutted. Among the items of testimony Mr. Davis now claims should have been presented was testimony from Clint and Victoria Hart, who at one time lived in the same apartment as the Davises. In an interoffice memorandum prepared for Mr. Davis's first attorneys, public defenders, an investigator reported a conversation he had with the Harts, in which they said the following things about the Davises:

> ". . . [T]hey [the Davises] were ripping everybody off, they would borrow money and never paid it back, they were charging for services at the apartments giving receipts for the services and pocketing the money then blaming the owner for having to charge for the services.
>
> . . . Gary drank a lot and . . . they were swingers and tried to get people to swap partners and even jokingly approached them about doing it. . . .
>
> . . . .
>
> . . . [B]oth Gary and Becky were bull shitters but Becky seemed to have the upper hand on that and . . . they both lied consistently about everything . . . .
>
> . . . Becky acted like she was [in charge] but Gary was the one that really was, he was more subdued where as Becky was talkative and would just rattle on especially when she was lieing [sic]."

-24-

Interoffice Mem. dated 9/10/86, Appellee's Addendum. Such negative information about the Davises was obviously more likely to harm rather than help Mr. Davis in front of the jury, and certainly suggested that finding truly helpful mitigating testimony from acquaintances was going to be extremely difficult. We therefore see no prejudice from Mr. Truman's decision not to present testimony from the Harts.

Mr. Davis also argues Mr. Truman should have presented testimony from Robert Russell, an acquaintance of Mr. Davis and Leona Coates. In a memorandum prepared for Mr. Davis's first attorneys, Investigator Jim Smith described an interview with Mr. Russell, in which Mr. Russell generally described how he and Mr. Davis used to go drinking together, and stated that Mr. Davis was not unfaithful to Leona Coates during their marriage. Mr. Russell also said he was "surprised" to hear of Mr. Davis's involvement in the murder. Interoffice Mem. dated 10/9/86, R. Vol. VI. In another memorandum prepared in connection with Mr. Davis's habeas petition, Mr. Russell described Mr. Davis as a good, kind and dependable father and worker, without "a mean bone in his body." Pet'r's Ex. No. 107, R. Vol. IX. He further offered his opinion that "the murder had to do with alcohol and someone else's influence." Id. We again see no prejudice to Mr. Davis from the failure to present testimony from Mr. Russell, given its generality and vagueness in 1986 (merely expressing "surprise" about Mr. Davis's involvement in the murder). Even as elaborated nine years later, Mr. Russell's characterization of Mr. Davis as lacking "a mean bone in his body" is flatly inconsistent

-25-

with a multitude of other evidence about Mr. Davis, and the reference to alcohol does little to help Mr. Davis other than to raise once again all of the problems discussed above with using alcoholism as a mitigating circumstance in Mr. Davis's particular case.

Finally, Mr. Davis argues he suffered prejudice from the failure to present testimony from Pauline Cowell, the woman for whom the Davises worked at the time of the May murder. In the same memorandum prepared in 1986 by Investigator Jim Smith, Mr. Smith described an interview with Ms. Cowell, in which she said that Mr. Davis "was usually very shy around her," and that she "does not believe that Gary killed Ginny [May], she is not sure what role he played in it but she does not believe he did it." Interoffice Mem. dated 10/9/86, R. Vol. VI. She also said that "the stories they, especially Becky told, turned out to be half truths or out right lies." Id. As with the other acquaintance testimony, it is hard to see how this would have made any difference with the jury. Ms. Cowell said she did not believe Mr. Davis killed Ms. May, but her otherwise unsupported belief was completely contradicted by Mr. Davis's own testimony.

Ms. Cowell also offered that both the Davises told "half truths or out right lies."[13] That is hardly likely to positively impact the jury deliberating Mr. Davis's fate.

In sum, we find no prejudice from the failure to call these various acquaintances of Mr. Davis to testify in the penalty phase of the trial.

4. **Prison Records:**

Mr. Davis also argues that Mr. Truman should have presented more testimony supportive of the statutory mitigator that Mr. Davis would not be a continuing threat to society. Mr. Truman did present testimony in the penalty phase from Lieutenant Allen, who had supervised Mr. Davis while he was in the Adams County jail awaiting trial, and who testified to his good conduct during his incarceration. Mr. Davis argues a better witness concerning his conduct while in prison would have been Leonard Foster, who supervised Mr. Davis while he was in prison for his prior sexual assault conviction. Mr. Foster told an investigator from the Federal Public Defender's office that Mr. Davis was a

---

[13]Mr. Davis also argues Mr. Truman should have presented testimony from Charles Ledbetter, Ms. Fincham's first husband. He testified by way of deposition in Mr. Davis's habeas proceeding, and stated that Ms. Fincham was basically untruthful, was sexually promiscuous, was a good shot and felt comfortable with firearms. Ledbetter Dep., Pet'r's Ex. No. 61, R. Vol. IX. All of this testimony was presumably relevant to the equal justice defense pursued throughout the trial by Mr. Truman, but effectively undermined by Mr. Davis's own testimony. As with other purportedly mitigating evidence designed to suggest that Ms. Fincham was the more culpable, Mr. Ledbetter's testimony would not have affected the jury, which had just heard and watched Mr. Davis testify himself and take full responsibility for the murder.

model prisoner during that time. He further stated that, had he been asked to testify at the time of Mr. Davis's trial, he would have stated his opinion that "Gary Davis could successfully serve a term of life imprisonment." Sholl Aff. ¶ 11, Pet'r's Ex. No. 109, R. Vol. IX.

Although Mr. Davis for some reason now believes that Mr. Foster would have provided the better testimony in mitigation, Mr. Foster's testimony basically duplicates that of Lieutenant Allen. Thus, Mr. Davis's conduct while incarcerated was already before the jury. The failure to present Mr. Foster to provide essentially the same testimony did not prejudice Mr. Davis. Moreover, additional testimony as to Mr. Davis's ability to function well and adjust comfortably to prison life might have negatively affected jurors who wished to see that Mr. Davis received a severe penalty for an admittedly horrible crime. Details from Mr. Davis's prison records would also, of course, have reminded the jury of Mr. Davis's criminal history, with its increasingly violent behavior.

Furthermore, against all of this evidence which Mr. Davis presented in the federal district court, and which he claims Mr. Truman erroneously failed to present in the penalty phase of his trial, we must weigh the aggravating factors present in this case. Although Mr. Davis challenges five of the six aggravating factors found by the jury, as we explain below, we find four of the five were constitutional and supported by the evidence, and the submission of the unconstitutionally vague aggravator was harmless

error.[14]  As we have stated before, the sentence in this case was not "'only weakly supported by the record.'"  Brewer, 51 F.3d at 1527 (quoting Strickland, 466 U.S. at 694).  Indeed, Mr. Davis's own words, detailing his participation in the crime and his assumption of full responsibility for it, were fresh in the jurors' minds.  See Thompson v. Calderon, 86 F.3d 1509, 1525 (9th Cir. 1996) ("The State's case against [petitioner] was strong . . . . [Petitioner] himself made it much stronger by testifying after counsel advised him not to testify.").  As we stated in Brewer:

> Given the State's overwhelming case against him, the number and gravity of the aggravating circumstances found by the jury, and the nature of the crime itself, we do not believe that the speculative, conclusory, and possibly damaging mitigating evidence offered now . . . would have resulted in the imposition of a sentence other than death.

Brewer, 51 F.3d at 1527.  We are equally confident that the speculative, cumulative and almost certainly damaging evidence offered now in this case would not have resulted in the imposition of a different sentence.  See Marek v. Singletary, 62 F.3d 1295, 1300-01 (11th Cir. 1995) ("Given the particular circumstances of this case and the overwhelming evidence against Marek, evidence of an abusive and difficult childhood would have been entitled to little, if any, mitigating weight."), cert. denied, 65 U.S.L.W. 3259 (U.S. Oct. 7, 1996) (No. 95-9105); Bonin v. Calderson, 59 F.3d 815, 836 (9th Cir. 1995) ("'[I]n cases with overwhelming evidence of guilt, it is especially difficult to show prejudice from a claimed error on the part of trial counsel.'") (quoting United States v. Coleman, 707 F.2d

_____

[14]As we explain, infra, two of the aggravators also overlapped.

-29-

374, 378 (9th Cir.), cert. denied, 464 U.S. 854 (1983)), cert. denied, 116 S. Ct. 718 (1996); Andrews v. Collins, 21 F.3d 612, 624 (5th Cir. 1994) (holding that in light of evidence that defendant stood over victim and shot him directly in forehead with a bullet altered to cause more devastation on impact, defendant suffered no prejudice from counsel's alleged ineffectiveness), cert. denied, 115 S. Ct. 908 (1995); People v. Rodriguez, 914 P.2d 230, 296 (Colo. 1996) ("Given the brutal circumstances surrounding the murder of [the victim] and the overwhelming evidence of aggravation against [defendant], . . . trial counsel's failure to present the proposed mitigating evidence of child abuse [did not] materially affect[] the imposition of" the death penalty.).

## II.  Statutory Aggravators.

The trial court instructed the jury on six statutory aggravators.[15]  The jury found the existence of all six beyond a reasonable doubt.  Mr. Davis challenges five of the six.

---

[15]The six aggravators were:

        (a) The class 1 felony was committed by a person under sentence of imprisonment for a class 1, 2, or 3 felony as defined by Colorado law or United States law . . . .

     . . .

        (d) The defendant intentionally killed a person kidnapped or being held as a hostage by him or by anyone associated with him; or

        (e) The defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; or

     . . .

        (g) The defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants; or

     . . .

        (j) The defendant committed the offense in an especially heinous, cruel, or depraved manner; or

        (k) The class 1 felony was committed for the purpose of avoiding or preventing a lawful arrest or prosecution or effecting an escape from custody.  This factor shall include the intentional killing of a witness to a criminal offense.

Colo. Rev. Stat. § 16-11-103(6)(1986).

-31-

Colorado's capital sentencing scheme involves four steps. The Colorado Supreme

Court has described it as follows:

> First, the jury must determine if at least one of the statutory aggravating
> factors exists. §§ 16-11-103(2)(a)(I), -(6). If the jury does not unanimously
> agree that the prosecution has proven the existence of at least one statutory
> aggravator beyond a reasonable doubt, the defendant must be sentenced to
> life imprisonment. §§ 16-11-103(1)(d), -(2)(b)(I), -(2)(c). Second, if the
> jury has found that at least one statutory aggravating factor has been proven,
> the jury must then consider whether any mitigating factors exist. §§ 16-11-
> 103(2)(a)(II), -(5). "There shall be no burden of proof as to proving or
> disproving mitigating factors," § 16-11-103(1)(d), and the jury need not
> unanimously agree upon the existence of mitigating factors. Third, the jury
> must determine whether "sufficient mitigating factors exist which outweigh
> any aggravating factor or factors found to exist." § 16-11-103(2)(a)(II).
> Fourth, and finally, if the jury finds that any mitigating factors do not
> outweigh the proven statutory aggravating factors, it must decide whether
> the defendant should be sentenced to death or to life imprisonment. § 16-
> 11-103(2)(a)(III).

People v. Tenneson, 788 P.2d 786, 789 (Colo. 1990) (citations omitted); see also People

v. White, 870 P.2d 424, 438 (Colo.), cert. denied, 115 S. Ct. 127 (1994).[16]

"The constitutional validity of aggravating factors is a question of law subject to

de novo review." United States v. McCullah, 76 F.3d 1087, 1107 (10th Cir. 1996). What

happens when an unconstitutional aggravator has been submitted to the sentencer

depends, in part, on whether the state sentencing scheme involves weighing of

aggravating and mitigating circumstances.

---

[16]The statutory sentencing scheme has been amended a number of times since Mr.
Davis's trial.

In a weighing state, "after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence." Stringer v. Black, 503 U.S. 222, 229 (1992). By contrast, in a non-weighing state "the jury must find the existence of one aggravating factor before imposing the death penalty, but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case." Id. at 229-30.

If an unconstitutional aggravating factor has been submitted to the jury in a weighing state, an appellate court may independently reweigh the aggravating and mitigating factors, omitting the unconstitutional one, and determine if the sentence is nonetheless appropriate. Clemons v. Mississippi, 494 U.S. 738, 750 (1990). Alternatively, the appellate court may conduct a harmless error analysis, determining whether the submission to the jury of the unconstitutional aggravator was harmless. Id. at 752. Additionally, the Supreme Court has indicated that "a state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined," Walton v. Arizona, 497 U.S. 639, 654 (1990), and on federal habeas review of such a decision, "the state court's application of the narrowing construction should be reviewed under the 'rational factfinder' standard of Jackson v. Virginia, 443 U.S. 307 (1979)." Richmond v. Lewis, 506 U.S. 40, 47 (1992).

In a non-weighing state, by contrast,

> so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty. Assuming a determination by the state appellate court that the invalid factor would not have made a difference to the jury's determination, there is no constitutional violation resulting from the introduction of the invalid factor in an earlier stage of the proceeding.

Stringer, 503 U.S. at 232; see also Tuggle v. Netherland, 116 S. Ct. 283 (1995); Zant v. Stephens, 462 U.S. 862 (1983); Tuggle v. Netherland, 79 F.3d 1386 (4th Cir. 1996) (applying harmless error analysis to Ake v. Oklahoma, 470 U.S. 68 (1985), error in capital sentencing proceeding in a non-weighing state), cert. denied, 1996 WL 442391 (U.S. Oct. 7, 1996) (No. 96-5364).

Step three of Colorado's four-step capital sentencing scheme clearly requires weighing of aggravating and mitigating circumstances. Step four, however, "require[s] the jury to make an independent decision whether to impose a sentence of life imprisonment or death where mitigating factors did not outweigh aggravating factors." People v. District Court, 834 P.2d 181, 185 (Colo. 1992); see also People v. Young, 814 P.2d 834, 841 (Colo. 1991). It thus is more similar to the sentencing decision made in a non-weighing state.[17] The Supreme Court has not specifically indicated whether the

---

[17]The Colorado Supreme Court in Davis I considered Colorado's sentencing scheme to be a weighing one. Davis I, 794 P.2d at 178; see also People v. Rodriguez, 914 P.2d 230, 329 (Colo. 1996) (Lohr, J., dissenting); Stephen Hornbuckle, Note, Capital Sentencing Procedure: A Lethal Oddity in the Supreme Court's Case Law, 73 Tex. L.

(continued...)

Clemons reweighing/harmless-error analysis or the Zant analysis applies to states having "hybrid" systems like Colorado's. See Flamer v. Delaware, 68 F.3d 736, 769 (3d Cir. 1995) (Lewis, J., dissenting), cert. denied, 116 S. Ct. 807 (1996).

Mr. Davis suggests that a harmless error analysis is not possible under Colorado's capital sentencing scheme, apparently because of the fourth step. While he is not completely clear, we assume his argument is that a harmless-error analysis is unavailable in a non-weighing scheme, and therefore unavailable in Colorado because of that fourth step. We disagree with his characterization of Colorado's capital sentencing scheme. While the fourth step in the sentencing process does indeed appear to give the jury the opportunity to consider any and all reasons for imposing a sentence of life or death, the third step clearly and specifically requires the jury to weigh aggravating and mitigating factors. The jury does not reach the fourth step unless it has determined that any mitigating factors do not outweigh the proven statutory aggravators. Because weighing thus performs a critical function in the jury's sentencing scheme, we apply, where

---

[17](...continued)
Rev. 441, 448 n.38 (1994) (including Colorado's capital sentencing scheme among list of weighing states). The state's position on whether Colorado is a weighing or a non-weighing jurisdiction is interesting. In its answer brief, the state argued that Colorado is a weighing state, such that appellate reweighing or harmless error analysis could cure any error in the submission of an invalid aggravator to the jury. Resp't-Appellee's Answer Br. at 80. At oral argument, however, in an effort to avoid the effect of one part of our recent decision in McCullah, 76 F.3d at 1111-12, the state argued that the fourth step really makes Colorado more like a non-weighing state.

appropriate, the <u>Clemons</u> harmless error analysis.[18]  We turn now to the specific

allegations of error.

> A.  **Aggravating Factor of "Avoiding or Preventing Lawful Arrest or Prosecution":**

One of the statutory aggravators presented to the jury was the following:

> The class I felony was committed for the purpose of avoiding or preventing
> a lawful arrest or prosecution or effecting an escape from custody.  This
> factor shall include the intentional killing of a witness to a criminal offense.

Colo. Rev. Stat. § 16-11-103(6)(k).  Mr. Davis objected to the instruction on the ground

that the aggravator should only apply when a witness of a crime is killed to prevent the

investigation or prosecution of that other, separate, crime or when a law enforcement

officer is killed while attempting to arrest someone.  The trial court overruled the

objection.

---

[18]Although neither party pursues this, there is actually a question whether harmless
error analysis is available to us on federal habeas review where the error involves the
submission to the jury of an unconstitutionally vague aggravating circumstance.  There is
currently a split in the circuits on whether federal habeas courts have the power to
conduct a harmless error analysis when reviewing a capital sentencing proceeding that
involved an invalid statutory aggravating circumstance.  <u>Compare</u> <u>Smith v. Dixon</u>, 14
F.3d 956, 974-81 (4th Cir. 1994) (en banc) (holding that it had authority to review
whether submission of unconstitutionally vague heinousness aggravator to jury was
harmless error), <u>cert. denied</u>, 115 S. Ct. 129 (1994) <u>and</u> <u>Williams v. Clarke</u>, 40 F.3d 1529,
1539-40 (8th Cir. 1994) (same), <u>cert. denied</u>, 115 S. Ct. 1397 (1995) <u>with</u> <u>Wiley v.
Puckett</u>, 969 F.2d 86, 94 n.8 (5th Cir. 1992) (holding that federal habeas courts cannot
conduct harmless error analysis where invalid aggravator was submitted to jury in capital
sentencing proceeding but instead must remand to state courts in the first instance); <u>see
also</u> O'Guinn v. Dutton, 88 F.3d 1409, 1461 (6th Cir. 1996) (Batchelder, J., dissenting);
<u>Flamer</u>, 68 F.3d at 770-71 (Lewis, J., dissenting).  We agree with the Fourth and the
Eighth Circuits, for the reasons set forth in their decisions, that we have the authority.

To be constitutional, an aggravating circumstance must "not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." Tuilaepa v. California, 114 S. Ct. 2630, 2635 (1994). "If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm." Arave v. Creech, 507 U.S. 463, 474 (1993). Additionally, "the aggravating circumstance may not be unconstitutionally vague." Tuilaepa, 114 S. Ct. at 2635.

The Colorado Supreme Court agreed with the state's interpretation of this aggravator, that it "is appropriate if the evidence indicates that a defendant has murdered the victim of a contemporaneously or recently perpetrated offense and the reason for the murder was to prevent the victim from becoming a witness." Davis I, 794 P.2d at 187. The "antecedent crime must be one which is not inherent or necessarily incident to murder such as assault or battery, otherwise every murder would be punished by death." Id. at 187 n.22. The Colorado court observed that "[b]y putting the focus on the purpose of the murder, this aggravating factor cannot be said to include all murder victims because they are all potential witnesses." Id. at 187. Mr. Davis argues this interpretation fails to effectively narrow the class of defendants subject to the death penalty, because all murder victims are thereby prevented from testifying against their murderers. He argues "Mrs. May was not a witness to a criminal offense independent of the murder. Rather,

the crimes upon her that she had witnessed were part of the same continuous criminal transaction as the murder." Appellant's Opening Br. at 78.

We agree with the Colorado Supreme Court, whose analysis the district court adopted, that the statutory aggravator sufficiently narrows the class of defendants to whom it applies. Several other states have a similar statutory aggravating circumstance. Arkansas, for example, includes among its aggravating circumstances that "[t]he capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody." Ark. Code Ann. § 5-4-604(5). The Eighth Circuit recently rejected an argument that the provision "does not genuinely narrow the class of persons eligible for the death penalty." Wainwright v. Lockhart, 80 F.3d 1226, 1231 (8th Cir. 1996), petition for cert. filed, (U.S. Aug. 29, 1996) (No. 96-5760). In Wainwright, the court held that the aggravator was properly applied to a murder which was committed in the course of a robbery, in order to prevent the murderer's identification by the victim. See also Joubert v. Hopkins, 75 F.3d 1232, 1247 (8th Cir.) (upholding validity of Nebraska statutory aggravator that the killing was committed to hide the perpetrator's identity where defendant kidnaped victims before killing them), cert. denied, 116 S. Ct. 2574 (1996); Ruiz v. Norris, 71 F.3d 1404, 1408 (8th Cir. 1995), petition for cert. filed, (U.S. May 28, 1996) (No. 95-9119); Miller v. State, 605 S.W.2d 430, 439-40 (Ark. 1980) (upholding validity of statutory aggravator that murder was committed for purpose of avoiding arrest where defendant robbed victim before killing him), cert. denied, 450 U.S.

1035 (1981); Thompson v. State, 648 So. 2d 692, 695 (Fla. 1994) (upholding validity of statutory aggravator that murder was committed for purpose of avoiding arrest where defendant kidnaped and robbed victims before murdering them), cert. denied, 115 S. Ct. 2283 (1995); Walker v. State, 671 So. 2d 581, 602 (Miss. 1995) (upholding validity of statutory aggravator that murder was committed for purpose of avoiding or preventing a lawful arrest where defendants kidnaped and raped victim before murdering her), petition for cert. filed, (U.S. July 16, 1996) (No. 96-5259); State v. Hightower, 680 A.2d 649, 663 (N.J. 1996) (upholding validity of statutory aggravator that murder was committed to avoid apprehension where victim was robbed prior to murder, and observing that "[t]he fact that a murder occurs contemporaneously with the witnessed underlying crime does not mitigate the evil of killing a potential witness"); State v. Gregory, 459 S.E.2d 638, 664 (N.C. 1995) (upholding validity of statutory aggravator that murders were committed for the purpose of avoiding or preventing a lawful arrest where defendants had kidnaped and raped victims prior to killing them), cert. denied, 116 S. Ct. 1327 (1996).  In each of these cases, the aggravating circumstance was applied where an antecedent crime (rape or kidnaping or robbery) occurred, and the murderer killed the victim to prevent the victim's identification of the murderer for the antecedent crime.[19]  That is exactly what occurred in

---

[19]Among the cases upon which Mr. Davis relies in his argument that the avoiding arrest aggravator is unconstitutional is People v. Silva, 754 P.2d 1070 (Cal. 1988), cert. denied, 488 U.S. 1019 (1989), in which the California Supreme Court invalidated the application of a witness-murder statutory aggravator where a kidnaping, robbery and

(continued...)

this case:  Mr. Davis testified that he killed Ms. May so she would not be a live witness.

R. Vol. V, Vol. 32 at 73.  Further, the evidence in this case concerning the Davises'

motivation for murdering Ms. May, which Mr. Davis does not dispute, supports the

conclusion that their motivation for kidnaping Ms. May was to subject her to various

sexual abuses, and she was then murdered so she would not identify them.  We find

nothing unconstitutional in the application of this aggravator to Mr. Davis.


**B.**      **Application of the "Party to an Agreement" Aggravator:**

Mr. Davis also challenges the statutory aggravator that Mr Davis "has been a party

to an agreement to kill another person in furtherance of which a person has been

intentionally killed."  Colo. Rev. Stat. § 16-11-103(6)(e).  He argues, as he did at his trial,

that this aggravator should only apply to contract killings, not to "simple conspiracy."

Appellant's Opening Br. at 87.

As the Supreme Court has stated, "[s]tates must properly establish a threshold

below which the [death] penalty cannot be imposed."  Romano v. Oklahoma, 114 S. Ct.

2004, 2009 (1994); McCleskey v. Kemp, 481 U.S. 279, 305 (1987).  To that end, they

---

[19](...continued)
murder "were part of one continuous transaction."  Id. at 1084.  However, the California
statute in question specifically excludes from its ambit the killing of a witness-victim
where the killing was "committed during the commission, or attempted commission of the
crime to which he or she was a witness."  Cal. Penal Code § 190.2(a)(10).  Colorado's
statutory aggravator has no such specific limitation excluding a killing committed during
the commission of the crime to which the victim was a witness.

must "establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." Id. We have recognized that "aggravating circumstances must be described in terms that are commonly understood, interpreted and applied. To truly provide guidance to a sentencer who must distinguish between murders, an aggravating circumstance must direct the sentencer's attention to a particular aspect of a killing that justifies the death penalty." Cartwright v. Maynard, 822 F.2d 1477, 1485 (10th Cir. 1987), aff'd, 486 U.S. 356 (1988). An aggravating circumstance cannot be so vague that it fails to effectively channel the sentencer's discretion, and it must contribute to the kind of individualized sentencing necessary for the imposition of the death penalty. "Beyond these limitations, . . . the Court has deferred to the State's choice of substantive factors relevant to the penalty determination." California v. Ramos, 463 U.S. 992, 1001 (1983).

Mr. Davis makes no specific argument why the "party to an agreement" aggravator is not a rational criterion by which Colorado could select those for whom the death penalty is permissible. He simply argues that the Colorado legislature did not intend it to apply other than to contracts for hire, an argument the Colorado Supreme Court rejected, and that no other state includes such an aggravator in its capital sentencing scheme. Neither argument persuades us that habeas relief is necessary.

The Colorado Supreme Court examined the legislative history behind the statute, and determined that it was not limited to "contract-murders," as Mr. Davis argues.

-41-

Absent some compelling argument that that interpretation violates the federal constitution, we will not disturb it.  See Bowser v. Boggs, 20 F.3d 1060, 1065 (10th Cir.) ("We will not second guess a state court's application or interpretation of state law on a petition for habeas unless such application or interpretation violates federal law."), cert. denied, 115 S. Ct. 313 (1994); Hamm v. Latessa, 72 F.3d 947, 954 (1st Cir. 1995) (same), cert. denied, 1996 WL 375754 (U.S. Oct. 7, 1996) (No. 95-9428); see also Mansfield v. Champion, 992 F.2d 1098, 1100 (10th Cir. 1993) ("In a habeas corpus proceeding under section 2254, a federal court should defer to a state court's interpretation of state law in determining whether an incident constitutes one or more than one offense for double jeopardy purposes.").  And the fact that Colorado may be the only state which permits such an aggravator by itself indicates no constitutional infirmity.  As the Supreme Court has made clear, unless the aggravator is unconstitutionally vague on its face, or otherwise impedes the requirement that sentencing determinations be individualized, states are free to select whatever substantive criteria they wish to determine who is eligible for the death penalty.  See Spaziano v. Florida, 468 U.S. 447, 464 (1984) ("The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws.").

### C.    Consideration of the "Especially Heinous, Cruel or Depraved" Aggravator:

The jury was also instructed on the aggravating factor that "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner."  Colo. Rev. Stat. § 16-11-103(6)(j).  The trial court offered no elaboration of the language of the statute, and overruled Mr. Davis's objection to the aggravator as unconstitutionally vague.

The United States Supreme Court in Maynard v. Cartwright, 486 U.S. 356 (1988), held that Oklahoma's "especially heinous, atrocious or cruel" statutory aggravator, if presented to a jury without further elaboration and explication, was unconstitutionally vague.  The Colorado Supreme Court in Davis I correctly concluded that, under Cartwright, the trial court improperly permitted the jury to consider the "especially heinous, cruel or depraved" aggravator.  The Colorado court further held that, under Proffit v. Florida, 428 U.S. 242 (1976), "the prosecutor could prove the existence of this aggravator by showing that the defendant committed the crime in a 'conscienceless or pitiless' manner which was 'unnecessarily torturous to the victim.'"  Davis I, 794 P.2d at 176-77.  The court went on to determine whether, "beyond a reasonable doubt, . . . had the aggravator properly been narrowed the jury would have returned a verdict of death." Id. at 179.  It concluded that it would have, and that the error was therefore harmless beyond a reasonable doubt.

Mr. Davis argues the Colorado Supreme Court erred in two respects:  (1) it emphasized heavily the evidence supporting the "heinous, cruel or depraved" aggravator,

-43-

while failing to mention or discuss any mitigating evidence in conducting its harmless error review; and (2) harmless error review is impossible because of Colorado's peculiar capital sentencing scheme. We have already rejected this second argument and concluded that harmless error analysis is available. We must still determine whether the Colorado Supreme Court properly cured the error, either by correctly applying a narrowing construction or otherwise conducting a harmless error analysis.

The Colorado Supreme Court held that the properly narrowed definition of the "heinous, cruel or depraved" aggravator was the one set out in Proffit. Mr. Davis does not dispute the validity of that narrowed definition. He simply disagrees with the way the Colorado court applied that standard, arguing it is "'nothing but a facile guess at what the jury would have found under a totally hypothetical set of instructions that realistically could not possibly have been within the contemplation of any juror when this case was decided.'" Appellant's Opening Br. at 81 (quoting Davis I, 794 P.2d at 222 (Quinn, C.J., dissenting)). He further argues the court made no reference to the mitigating evidence presented to the jury.

When reviewing a state court's application of a properly narrowed definition of a facially vague aggravator, we "uphold the state court's finding so long as a rational factfinder could have found the elements identified by the construction--here, that the crime involved [conscienceless or pitiless conduct and was unnecessarily torturous to the victim]." Hatch v. Oklahoma, 58 F.3d 1447, 1469 (10th Cir. 1995), cert. denied, 116 S.

-44-

Ct. 1881 (1996); see also Richmond v. Lewis, 506 U.S. 40, 47 (1992); Jackson v.

Virginia, 443 U.S. 307, 319 (1979).  The Colorado Supreme Court found the necessary

facts to establish that the murder was committed in a conscienceless or pitiless manner,

and was unnecessarily torturous to the victim.  Davis I, 794 P.2d at 179-80.  It then held

that, because a jury given a properly narrowed definition of  the "heinousness" aggravator

would still have found the aggravator established, it was harmless error beyond a

reasonable doubt to instruct the jury without that narrowed definition.  Under Richmond,

Walton and our Hatch decision, we perceive no error in the Colorado Supreme Court's

"curing" the submission to the jury of the vague aggravator.

Alternatively, were we to agree that, despite its use of the term "harmless error,"

the Colorado Supreme Court did *not* properly conduct a harmless error analysis because it

did not explicitly consider mitigating evidence, we could apply the harmless error

standard of Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Under Brecht, federal

courts on habeas review of trial errors must ask "whether the error 'had substantial and

injurious effect or influence in determining the jury's verdict.'"  Id. (quoting Kotteakos v.

United States, 328 U.S. 750, 776 (1946)).  In making that evaluation, the Supreme Court

has indicated that "where the record is so evenly balanced that a conscientious judge is in

grave doubt as to the harmlessness of an error," the error is not harmless.  O'Neal v.

McAninch, ___ U.S. ___, ___, 115 S. Ct. 992, 995 (1995).[20]  Thus, under Brecht, we

would inquire whether the submission of the vague aggravator had a substantial and

injurious effect on the jury's verdict.  As we have previously stated, "our task is not

merely to determine whether there was sufficient evidence to convict . . . in the absence

of [the error]."  Tuttle v. Utah, 57 F.3d 879, 884 (10th Cir. 1995).  Rather, it is to

"determine, in light of the entire record, whether [the error] so influenced the jury that we

cannot conclude that it did not substantially affect the verdict, or whether we have grave

doubt as to the harmlessness of the error alleged."  Id.

Applying that standard, we conclude that the submission to the jury of the vague

"heinousness" aggravator was harmless error.  The jury was given six statutory

aggravators.  Mr. Davis does not dispute the applicability of one of the six (that the crime

was committed while he was on parole for another crime).  We have just held that two

_____

[20]While there is some disagreement as to whether the Brecht/Kotteakos standard applies in all federal habeas proceedings where a trial error is claimed to be harmless, or only when the state appellate court has previously applied the more stringent Chapman "harmless beyond a reasonable doubt" standard to the claimed error, our circuit agrees with those courts holding that the Brecht/Kotteakos standard applies in all proceedings. See Castro v. Oklahoma, 71 F.3d 1502, 1515-16 and n.14 (10th Cir. 1995); Brewer, 51 F.3d at 1529; see also Sherman v. Smith, 89 F.3d 1134, 1140 (4th Cir. 1996); Tyson v. Trigg, 50 F.3d 436, 446-47 (7th Cir. 1995), cert. denied, 116 S. Ct. 697 (1996); Horsley v. Alabama, 45 F.3d 1486, 1492 n.11 (11th Cir.), cert. denied, 116 S. Ct. 410 (1995); but see, Starr v. Lockhart, 23 F.3d 1280, 1292 (8th Cir.) (holding that Chapman standard applies because state courts did not apply that standard on direct review), cert. denied, 115 S. Ct. 499 (1994); Orndorff v. Lockhart, 998 F.2d 1426, 1430 (8th Cir. 1993) (same), cert. denied, 114 S. CT.. 1631 (1994).  At least one panel of the Ninth Circuit has declined to decide the issue.  Hanna v. Riveland, 87 F.3d 1034, 1038 n.2 (9th Cir. 1996), modified, No. 95-33700, 1996 WL 473208 (9th Cir. June 25, 1996).

other aggravators, that the murder was committed to avoid arrest and that Mr. Davis was a party to an agreement to murder, were properly submitted to the jury and supported by the evidence. Thus, three valid aggravators were clearly before the jury.[21] In discussing the "heinous, cruel or depraved" aggravator in his closing argument, the prosecutor did not allude to any evidence or facts not already properly before the jury. Nor was that particular aggravator emphasized disproportionately in that closing argument. The valid aggravators, in our view, powerfully outweighed the mitigating evidence before the jury. In light of the entire record, we conclude that the submission of the unconstitutionally vague "heinousness" aggravator to the jury did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

### D.    Consideration of "Felony Murder" and "Kidnaping" Aggravators:

Two additional aggravating factors submitted to the jury were that Davis committed the felony of second degree kidnaping, and "in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants," Colo. Rev. Stat. § 16-11-103(6)(g), and that he "intentionally killed a person kidnapped or being held as a hostage by him or by anyone associated with him." Colo. Rev. Stat. § 16-11-103(6)(d). Mr. Davis argues that these

---

[21]Additionally, as discussed infra, two duplicative aggravators were submitted to the jury. They were not invalid; they merely overlapped. Thus, another valid aggravator was before the jury, in that Mr. Davis killed a person whom he had kidnaped.

-47-

two aggravating circumstances "involve the same indivisible course of conduct," Appellant's Opening Br. at 84, and that the submission of both to the jury fails to genuinely narrow the class of defendants eligible for the death penalty.

The Colorado Supreme Court in Davis I found that Mr. Davis "did not object to the presentation to the jury of the 'felony murder' aggravator[,] [n]or did he present a 'doubling up' argument to the court during the presentation of the 'kidnaping' aggravator." Davis I, 794 P.2d at 188. The court went on to observe that it was aware of no federal cases addressing the constitutionality, under federal law, of overlapping or duplicative aggravators, but found no error in Mr. Davis's case "[b]ecause, by the plain language of our statute, both aggravators applied under the facts of this case." Id. at 189. The court also observed that the jury was instructed that it was the weight assigned each aggravating factor, not their mere number, that guided the jury's deliberation. Id. Thus, the Colorado court found no error.

Since Davis I, our court has held that the submission of duplicative aggravating factors is constitutional error, at least under the weighing scheme of the federal death penalty statute, 21 U.S.C. § 848. United States v. McCullah, 76 F.3d 1087, 1111-12 (10th Cir. 1996); see also United States v. Tipton, 90 F.3d 861, 899 (4th Cir. 1996). In McCullah, we remanded for a "reweighing of the aggravating and mitigating factors." McCullah, 76 F.3d at 1112.

The state responds that Colorado's particular capital sentencing scheme includes both a weighing and a non-weighing component, and the fourth and last step in the sentencing process makes it ultimately a non-weighing state in which, under Zant v. Stephens, 462 U.S. 862 (1983), duplicative aggravators are not a problem. As we have indicated, in our view, Colorado's capital sentencing scheme contains a crucial weighing component. We thus treat it as a weighing state. In federal habeas review of a state court trial in which an error occurred in the submission of aggravating factors to a jury which must weigh aggravating and mitigating factors, we may conduct a harmless error analysis. See Clemons, 494 U.S. at 750; see also Brecht, 507 U.S. at 637.

Applying the Brecht standard, we must determine whether, in light of the entire record, the submission of the two aggravators addressing the same basic conduct had a "substantial and injurious effect or influence" on the jury's verdict. Id. As we stated above in discussing the effect of the "heinousness" factor on the jury, the jury had three valid aggravating factors before it. It also had Mr. Davis's own statement describing his involvement in the crime, and taking full responsibility for it. The jury was further specifically instructed that it could "assign any weight you wish to each aggravating and mitigating factor. It is the weight assigned to each factor, and not the number of factors found to exist that is to be considered." Jury Instruction No. 2, R. Vol. IV, Vol. 2 at 389. Similarly, Instruction No. 5 directed the jury that the weighing of mitigating and aggravating factors "is not a mere counting process in which numbers of aggravating

-49-

factors are weighed against numbers of mitigating factors. The number of the factors found is not determinative. . . . You must consider the relative substantiality and persuasiveness of the existing aggravating and mitigating factors in making this determination." Jury Instruction No. 5, id. at 394.

We assume that the jury did not blindly or unthinkingly add up the total number of aggravators, and weigh that number against the number of mitigators. Rather, we assume they followed the instructions to critically evaluate each factor, applying their "common sense understanding" to their obligation to weigh aggravating and mitigating factors. See Boyde v. California, 494 U.S. 370, 381 (1990). An instruction that the weighing process is not simply a mathematical exercise, but instead requires critical evaluation of the factors, can help to countervail any improper influence occasioned by the submission of duplicative aggravators. See United States v. Chandler, 996 F.2d 1073, 1093 (11th Cir. 1993) (noting that an instruction that "the weighing process was not a mechanical one and that different factors could be given different weight" can alleviate concern that the jury would be influenced by the number of aggravating factors), cert. denied, 114 S. Ct. 2724 (1994); United States v. Bradley, 880 F. Supp. 271, 289 n.8 (M.D. Pa. 1994) (noting that a curative instruction might countervail "any unfairness inherent in the weighing of a duplicative factor."); see also Parsons v. Barnes, 871 P.2d 516, 528-30 (Utah) (finding no prejudice to defendant from improper double-counting of aggravators where the jury was instructed "not in terms of the relative numbers of the aggravating and mitigating factors,

but in terms of their respective substantiality and persuasiveness."), cert. denied, 115 S. Ct. 431 (1994). In light of the entire record, we cannot conclude that the submission of both the felony murder and the kidnaping aggravators substantially influenced the jury's verdict.

### III. **Jury Instructions.**

Mr. Davis next argues that the trial court's instructions to the jury in the penalty phase of the trial misled the jury as to how it could evaluate mitigating evidence. In evaluating the impact on the jury of an ambiguous jury instruction, "the proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990). In assessing this "reasonable likelihood," we must remember the context in which juries utilize such instructions:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Id. at 380-81. Additionally, we "'must focus initially on the specific language challenged.'" California v. Brown, 479 U.S. 538, 541 (1987) (quoting Francis v. Franklin, 471 U.S. 307, 315 (1985)). "If the specific instruction fails constitutional muster, we then review the instructions as a whole to see if the entire charge delivered a

correct interpretation of the law."  Id.; see also McDougall v. Dixon, 921 F.2d 518, 533

(4th Cir. 1990), cert. denied, 501 U.S. 1223 (1991).


**A.  Mr. Davis's Plea for Mercy:**

Mr. Davis exercised his right of allocution during the closing argument of the

penalty phase.  He apologized for his commission of the crime, again stated that he, not

Ms. Fincham, was the guilty one, and asked for life.[22]  The court correctly instructed the

jury that they must "determine the facts from the evidence you have heard during the

entire trial including any additional evidence presented during the penalty phase hearing."

Jury Instruction No. 1, R. Vol. IV, Vol. 2 at 386.  It further instructed the jury that "[t]he

unsworn statement of the defendant is not evidence."  Id. at 387.  In instructing the jury

on mitigation, the court stated that the jury "should consider all of the evidence presented

at the trial and the sentencing hearing as it relates to mitigating factors."  Jury Instruction

No. 4, id. at 392.  Mr. Davis argues that these instructions amounted to a direction "not to

give any independent mitigating weight to Davis' expressions of remorse and his plea for

mercy," Appellant's Opening Br. at 93, and that the jury was thereby precluded from

considering relevant and powerful mitigating evidence.  We note, however, Mr. Davis

made no objection to the instructions when given.

---

[22]Mr. Davis said, in part, "I stated before, I'm the guilty one.  Becky was not
guilty.  She was not guilty of murdering Ginny May.  The only thing Becky was guilty of
was marrying me."  R. Vol. V, Vol. 33 at 50.

The Colorado Supreme Court, whose analysis the district court adopted, held that, considering the instructions as a whole and in the context of the sentencing hearing, there was no reasonable likelihood that the jury applied them in a way to prevent it from considering constitutionally relevant evidence.  Davis I, 794 P.2d at 193.  We agree.

First, considering the particular language of Instruction No. 1, the court told the jury that it was its "duty to determine the facts from the evidence" it had heard.  The court went on the discuss objections by lawyers, reminding the jury that it should not "draw any conclusions from such objections or from [the court's] rulings on the objections."  Instruction No. 1, R. Vol. IV, Vol. 2 at 386-87.  The court then instructed the jury, "[w]hen I told you not to consider a particular statement, you were told to put that statement out of your mind, and you may not consider any statement in your deliberations which you were instructed to disregard.  The unsworn statement of the defendant is not evidence."  Id. at 387.  That instruction plainly told that jury that there were certain statements made throughout the trial which it was specifically told to disregard.  When the jury was told to disregard a statement, it was to "put that statement our of your mind."  Id.  The jury was *not* told to disregard Mr. Davis's unsworn statement.  Rather, it was simply reminded that the statement was not "evidence."[23]

_____

[23]The Colorado Supreme Court observed that a statement in allocution is not technically evidence, since, under applicable Colorado law, evidence consists of the sworn statements of witnesses.  Mr. Davis does not claim the court erred in instructing the jury that Mr. Davis's statement was not, in fact, evidence.

Moreover, both the state and Mr. Truman alluded to Mr. Davis's statement in their closing arguments, and referred to particular statements he made therein. And Mr. Truman echoed Mr. Davis's plea for mercy at the end of his closing statement. Viewed both individually and in context, we are satisfied that there is no "reasonable likelihood" that the jury interpreted the court's instructions to prevent it from considering Mr. Davis's statement for what it was -- an unsworn personal plea from the defendant, echoed by his own attorney, for life rather than death.

## B. **Instructions on Mitigating Factors:**

Mr. Davis argues that other instructions erroneously conveyed to the jury that they must find any mitigating circumstances unanimously and beyond a reasonable doubt. He particularly challenges Instruction No. 5:

> If in the first two steps of your deliberations you have made unanimous findings that the prosecution has proven beyond a reasonable doubt that one or more aggravating factors exist and that no mitigating factors exist, or that a mitigating factor or factors exist, you must now decide whether the prosecution has proven that any factors in aggravation outweigh any factors in mitigation.

> In the third step of your deliberations you must weigh the aggravating factor or factors found to exist against any and all mitigating factors. . . .

> Your deliberations during this step of the proceeding can lead to one of two results:

1.  If all, or one or more of the jurors believe that a mitigating factor or factors outweigh the aggravating factor or factors found to exist, then the jury shall enter a verdict of life imprisonment.

2.  If all jurors unanimously agree that the aggravating factor or factors found to exist outweigh the mitigating factors or that there are no mitigating factors, then you shall continue your deliberations in accordance with these instructions.

R. Vol. IV, Vol. 2 at 394-95 (emphasis added).  Instruction No. 6 provided:

Each of you must also decide for yourself what weight to give each mitigating circumstance that you find exists.  Your decision as to what weight to give any mitigating circumstances does not have to be unanimous.  You do not have to take the decisions, opinions or feelings of any other juror into account, although you may do so if you wish.

Id. at 396.  While, read in isolation, the first paragraph of Instruction No. 5 could be read to require unanimity in the existence of mitigating factors, and that they must be found beyond a reasonable doubt, Instruction No. 6 makes it clear that there is no such unanimity requirement, nor is there a requirement that they be established beyond a reasonable doubt.  This is reinforced by the third paragraph of Instruction No. 5, which referred to "one or more of the jurors," as well as Instructions 2, 3, and 4, which stated repeatedly that aggravating factors must be proven beyond a reasonable doubt, but stated no such requirement for mitigating factors.  Instruction No. 4 specifically stated that "[t]here is no burden of proof as to proving or disproving mitigating factors."  Id. at 392.  Moreover, in his closing argument to the jury, after reminding the jury that it must find that aggravating circumstances exist beyond a reasonable doubt, the prosecutor stated, "we discussed the fact that you [the jury] decide what weight to give mitigating

-55-

circumstances, whether or not any mitigating circumstances exist." R. Vol. V, Vol. 33 at 41. Considered as a whole, there is no "reasonable likelihood" that the jury interpreted the instructions to require it to find mitigating factors unanimously or beyond a reasonable doubt. Nothing in the jury instructions rendered Mr. Davis's trial and sentencing so fundamentally unfair that habeas relief is required.

C. **Mitigating and Aggravating Factors in Equipoise:**

Mr. Davis argues that the weighing process mandated by Colorado's capital sentencing statute, as reflected in the court's jury instructions, permitted the jury to return a sentence of death if mitigating and aggravating factors were of equal weight.

Mr. Davis argued to the Colorado Supreme Court that the capital sentencing statute impermissibly authorized a death sentence when the aggravating and mitigating circumstances were of equal weight. The Colorado court noted that it had already rejected that very argument in People v. Tenneson, 788 P.2d 786 (Colo. 1990). Thus, Colorado's highest court has held that the statute itself does not permit the imposition of death when the aggravating and mitigating circumstances are in equipoise. The question remains whether the instructions in this case permitted such a sentence.

While Mr. Davis points to a few selected places where the instructions refer to mitigating factors "outweighing" aggravating ones, he neglects to point out the five other places throughout the jury instructions where the jury was clearly told that it must find

that one or more specified aggravating factors "outweigh" the mitigating factors.[24]

Furthermore, the prosecutor in his closing argument reminded the jury that he, representing the people, bore the "burden of proof as to the weighing process, as to whether the aggravating factors outweigh the mitigating factors." R. Vol. V, Vol. 33 at 40. In discussing the law, he told the jurors they must put mitigating circumstances "into this equation, and then you determine whether or not the aggravating circumstances you found beyond a reasonable doubt outweigh the mitigating circumstances." Id. at 41. In sum, there can be no doubt the jury knew that it had to find that aggravating circumstances outweigh mitigating before it could return a death sentence.

IV. **Exclusion of Three Prospective Jurors.**

---

[24]The fourth paragraph of Instruction No. 2 states "[i]f and only if the jury finds that one or more specified aggravating factors outweigh the mitigating factors, the jury then should proceed to the fourth step." R. Vol. IV, Vol. 2 at 389. The first paragraph of Instruction No. 5 directs the jury to "decide whether the prosecution has proven that any factors in aggravation outweigh any factors in mitigation." Id. at 394. The last paragraph of Instruction No. 5 echoes this: "If all jurors unanimously agree that the aggravating factor or factors found to exist outweigh the mitigating factors . . . then you shall continue your deliberations . . . ." Id. The first paragraph of Instruction No. 7 similarly states, "[i]f in the third step of your deliberations you have made unanimous findings that the aggravating factor or factors found to exist outweigh the mitigating factors . . . ." Id. at 397. Finally, the third paragraph of Instruction No. 9 states clearly: "In order to return a verdict of death, you must be convinced beyond a reasonable doubt that any aggravating factor or factors which are found to exist outweigh any mitigating factor or factors and that the death penalty is the appropriate penalty." Id. at 400.

Mr. Davis's final argument in support of his habeas petition is that the trial court erroneously excluded three prospective jurors from the panel because of their stated qualms about capital punishment. "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 420 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). A trial judge's determination of a potential juror's bias under the Witt/Adams standard is a factual finding entitled to the presumption of correctness contained in 28 U.S.C. 2254(d). Witt, 469 U.S. at 428-29; see also Antwine v. Delo, 54 F.3d 1357, 1369 (8th Cir. 1995), cert. denied, 116 S. Ct. 753 (1996). In making a determination as to impartiality, the trial judge's "predominant function . . . involves credibility findings whose basis cannot be easily discerned from an appellate record." Witt, 469 U.S. at 429; see also United States v. Tipton, 90 F.3d 861, 880 (4th Cir. 1996) ("Because what is being inquired into is a state of mind whose determination turns largely on assessments of demeanor and credibility, matters peculiarly within the province of trial judges, our review of those determinations is appropriately most deferential.").

Three prospective jurors were excused for cause: Thelma Wolfe, Michael Bradbury and Abie Olivas. We have carefully read the entire transcript of the voir dire of each prospective juror. Although Ms. Wolfe did state that, if under oath, she would follow the law, in response to more detailed questioning from the prosecutor and the

judge, she stated at least nine times that she did not believe in the death penalty and did not think she could impose it on anyone. R. Vol. V, Vol. 21 at 1085, 1086, 1089, 1090, 1092, 1093, 1097. Mr. Bradbury similarly responded that he could make various findings if his oath to follow the law so required it, but he stated quite clearly at least seven times that he did not believe in the death penalty and could not impose it on anyone. R. Vol. IV, Vol. 17 at 222, 223, 225, 226, 232. He even expressed his disagreement with the Colorado law permitting the imposition of the death penalty. Id. at 223. Given the deferential standard with which we review the trial judge's finding that these two jurors were not impartial, we cannot say that the court erred in excusing them for cause.

Prospective juror Olivas was also excused for cause, not because of stated views generally about the death penalty, but because he stated that his experience with and his views about alcohol would prevent him from ever imposing the death penalty in an alcohol-related crime. Mr. Davis argues that the removal of Mr. Olivas from the jury pool amounted to the removal of a juror who would consider alcohol as a mitigating factor. However, Mr. Olivas's views went further than that:

> MR. GRANT: If you hear evidence about him being under the influence of alcohol, is it a situation where you're not going to be able to consider whether aggravating factors exist?

> MR. OLIVAS: No, I won't be able to.

> MR. GRANT: You won't be able to think about any aggravating factors, all you have to hear is alcohol as a mitigating factor and you won't weigh anything against it, you will automatically vote for life?

-59-

Mr. OLIVAS:  That's right.

R. Vol. V, Vol. 23 at 1503.  Later in his voir dire, Mr. Olivas reiterated his views:

> MR. TRUMAN:  If the judge were to instruct you what the law is concerning alcohol as a mitigating factor, could you follow the law?
>
> Mr. OLIVAS: Yes, only to a certain extent.  Life in prison, 200 years in prison, but not the death penalty.
>
> MR. TRUMAN: So it's your opinion that if a man's drinking or drunk when he does something, that he ought not to get the death penalty?
>
> MR. OLIVAS:  That's right, because if alcohol is involved, I  don't think the death penalty.

Id. at 1510.  Again, given our deferential standard for reviewing a trial court finding of bias, we cannot conclude that the trial court erred in excusing Mr. Olivas.

## CONCLUSION

For the foregoing reasons, the district court order denying Mr. Davis's petition for a writ of habeas corpus is AFFIRMED.